In re CRAMOND.

(District Court, N. D. New York, June 6, 1906.)

1. BANKRUPTCY—LIENS—VALIDITY.

The rule that a bankrupt's trustee takes title to the bankrupt's property as of the date of the adjudication, subject to all valid liens thereon created more than four months prior to the filing of the bankruptcy petition, has no application to liens whenever created, which though valid as to the bankrupt are invalid as to creditors.

2. SAME—CREDITS OF BANKRUPT—ADMINISTRATION BY TRUSTEE.

Money due to a bankrupt on a paving contract at the time of the filing of his bankruptcy petition, though subject to valid liens, was properly paid to the bankrupt's trustee to be administered, and paid over to those entitled thereto under the direction of the bankruptcy court.

3. SAME—REFEREES—TRUSTEES—COMMISSIONS—PROPERTY SUBJECT TO LIENS.

Under Bankr. Act July 1, 1898, c. 541, §§ 40, 48, 30 Stat. 556, 557 [U. S. Comp. St. 1901, pp. 3436, 3439], as amended by Act Feb. 5, 1903, c. 487, §§ 9, 11, 32 Stat. 799 [U. S. Comp. St. Supp. 1905, pp. 687, 688], providing that referees shall be entitled to commissions on "all moneys disbursed to creditors by the trustee, and that trustees shall be entitled to such commissions on all moneys disbursed by them as may be allowed by the courts," credits of a bankrupt subject to valid liens, which credits were collected and disbursed in the bankruptcy proceedings, were liable for commissions to the referee and trustee in case the other property of the bankrupt was insufficient to pay such commissions and the expenses of administration.

4. SAME—LIEN CLAIMS—ALLOWANCE—STATUTES.

Bankr. Act July 1, 1898, c. 541, § 57a, 30 Stat. 560 [U. S. Comp. St. 1901, p. 3443], provides that secured creditors may prove their claims showing the claim, the consideration, and securities held therefor, and section 57e provides that secured claims and others having priority may be allowed for certain purposes, but shall be allowed only for such sums as to the courts seem to be owing over and above the value of the securities or priorities. Held, that such sections had reference to the allowance of secured claims for the purpose of fixing the sum on which a dividend from the general estate was to be paid, and for the limiting of the voting power or voice of the secured creditor or creditor having a priority at creditors' meetings.

5. SAME—LIENS—VALIDITY.

A municipal contractor, who subsequently became a bankrupt, after having assigned the amount to become due to him from a city on a paving contract to a bank for advances to enable him to perform the contract, made other similar assignments to materialmen for materials furnished. The materials were all furnished, and the work was completed and accepted subject to a slight deduction more than 30 days prior to the filing of the bankruptcy petition; the price being payable by the city within 90 days thereafter. Held, that such materialmen, though having filed and perfected a lien for the materials furnished, as authorized by Laws N. Y. 1897, p. 517, c. 418, § 5, were entitled to liens on the fund due from the city to the contractor by virtue of their assignments independent of the state law, which were enforceable against the fund in bankruptcy.

6. SAME—LABOR CLAIMANTS—NOTICE OF LIEN—FAILURE TO FILE.

Laws N. Y. 1897, p. 517, c. 418, § 5, provides for a lien for labor and materials furnished to a public contractor on the amount due from a state or municipal corporation. Section 12 (page 520) declares that at any time before the completion and acceptance of the improvement, and within 30 days thereafter, a person performing work for the contractor,

his subcontractor, assignee, or legal representative may file a notice of lien with the officer having charge of the disbursements of the state or corporate funds applicable to the contract under which the claim is made, and section 17 (page 522) declares that the lien for labor or materials shall not continue for a longer period than three months after the notice of the filing of the lien, unless an action is brought to foreclose the same, etc. *Held,* that persons having performed labor for a municipal contractor, who thereafter became bankrupt, having filed no notice of lien under such sections, had no lien on the amount due from the city to the contractor, though they were entitled to priority of payment over general creditors, under Bankr. Act, July 1, 1898, c. 541, § 64b, 30 Stat. 563 [U. S. Comp. St. 1901, p. 3447].

7. SAME—EQUITABLE LIENS—PRIORITY OF CLAIM.

Where a municipal contractor who subsequently became a bankrupt, on assuming a paving contract with the city, assigned all his right to money payable from the city under the contract to a bank in order to obtain money with which to perform the work, and the bank advanced money for such purpose in good•faith to enable the contractor to complete the contract, it acquired an equitable lien on the fund due from the city to the contractor, though some of the advancements were made after the contractor became insolvent, which was superior to the right to priority of payment given by Bankr. Act July 1, 1898, c. 541, § 64, 30 Stat. 563 [U. S. Comp. St. 1901, p. 3447], to labor claimants having no other lien.

8. SAME—STATE LAWS—NOTICE OF LIEN.

A bank, having advanced money to a municipal contractor to enable him to perform the contract, in consideration of an assignment of an amount due the contractor from the city, was not entitled to file a lien on such fund under Laws N. Y. 1897, p. 514, c. 418, providing for liens on funds due to public improvement contractors on behalf of "laborers and materialmen."

9. SAME—CLAIMS—PRIORITY OF PAYMENT—DEBTS HAVING PRIORITY.

Bankr. Act July 1, 1898, c. 541, § 64b, subd. 5, 30 Stat. 563 [U. S. Comp. St. 1901, p. 3447], providing for payment of debts owed to any person who by the laws of the state or the United States is entitled to priority, has no reference to liens actually existing on credits belonging to the bankrupt to be paid after the payment of taxes, subject to abatement for commissions expressly allowed to referees and trustees, etc.

Review of the decision of referee in bankruptcy adjudging that the costs and expenses of the proceedings in bankruptcy, including commissions of referee and trustee, and claims for labor performed within three months of the adjudication, not exceeding $300 to each laborer, be paid from the amount received by the trustee in bankruptcy on a street paving contract between William J. Cramond, now the bankrupt, and the city of Rome, N. Y., which money was not actually due and payable at the date of the filing of the petition in bankruptcy, before payment therefrom to certain assignees of the money to become due on such contract on assignments thereof made prior to the bankruptcy and more than three months prior thereto as security for advances of money to be made, and which were made, to carry on and prosecute the work to be done and procure the necessary material to be used in executing the contract, and also to procure .material to be used, and which was necessarily procured and used, in the execution and performance of such contract. The assignments of such money to become due and payable were made prior to the advances of money and furnishing of material and prior to the doing of any work on the contract. The labor claims, sought to be given priority, were for labor done for the contractor, now bankrupt, in the execution of such contract, and six of the assignees of such moneys filed liens pursuant to the lien law of the state of New York. The labor claimants, in question here, did not.

Wm. J. Powers and Thomas J. McNamara, for labor claimants.
D. F. Searle, for assignees of moneys.
McMahon & Larkin, for trustee.

RAY, District Judge. On the 26th day of August, 1904, the now bankrupt, William J. Cramond, then solvent, entered into a written contract with the city of Rome to pave, with brick, East Dominick street in said city from First street to the entrance to the Locomotive Works. He was to furnish all the material and perform all the labor and payment of the contract price, $26,009, was to be made 90 days after the completion and acceptance of the work. The contract also contained this provision:

"After the acceptance of all or any portion of the work by the common council, within ninety days thereafter, payments will be made for that portion, or all of the work accepted."

This contract was duly filed in the office of the chamberlain of the city of Rome. On the same day, August 26, 1904, the said William J. Cramond executed and delivered to the First National Bank of Rome, N. Y., an assignment, of which the following is a copy:

"For a valuable consideration to me in hand paid, the receipt whereof is hereby acknowledged, I hereby sell, assign, transfer and turn over unto the First National Bank of Rome the sum of ten thousand dollars ($10,000) with interest, of the moneys first due or to become due to me on a contract between the city of Rome and myself made and executed August 26, 1904, for the paving of E. Dominick street from First street to the Locomotive Works, the original of which contract is on file in the chamberlain's office of the city of Rome, and a copy of which is hereto attached and made a part hereof. And I hereby give and grant unto said the First National Bank of Rome full power and authority to collect and receive upon said contract from the said the city of Rome in my place and stead the said sum of $10,000, with interest thereon, and to take all necessary proceedings for the collection thereof, and to execute and deliver all proper receipts and vouchers therefor the same as I might or could do were not this assignment made. I hereby expressly represent that I have full power and authority to execute this assignment; that the said sum of money is to become due me from the said the city of Rome by reason of said contract; that no assignment or transfer of the moneys to become due upon said contract other than this has been executed by me, and the said the city of Rome, its common council and chamberlain, are hereby authorized and directed to pay to the said the First National Bank of Rome the said sum of $10,000, with interest thereon from the date hereof.

"Witness my hand and seal at Rome, N. Y., this 26th day of August, 1904.
                                        "William J. Cramond.   [L. S.]"

August 31, 1904, this assignment, or a copy thereof, was filed in the proper office. This assignment was made in good faith, and, in fact, to secure advances of money to be made and which were made, from time to time, by the bank to said Cramond to the amount of $10,000 to enable him to pay labor and purchase material to be used and which were used in performing the contract.

On the 2d day of September, 1904, said Cramond executed and delivered to the New York Brick & Paving Company of Syracuse, N. Y., another assignment of moneys to become due on such contract with the city of Rome, to the amount of $11,000, which was filed in

said office on the same day. The material part of said assignment reads as follows:

"For a valuable consideration to me in hand paid, the receipt whereof is hereby acknowledged, and in payment for and to secure the payment of bricks delivered and to be delivered, I hereby sell, assign, transfer and turn over to the New York Brick and Paving Company of Syracuse, New York, the sum of eleven thousand dollars ($11,000) of the moneys first due or to become due to me on a contract between the city of Rome and myself made and executed August 26th, 1904, for the paving of East Dominick street from First street to the Locomotive Works, the original of which contract is on file in the chamberlain's office of the city of Rome, N. Y., and a copy of which is hereto attached and made a part hereof. And I hereby give and grant unto said New York Brick and Paving Company full power and authority to collect and receive from the city of Rome upon said contract in my place and stead of said sum of eleven thousand dollars ($11,000), or whatever amount may be due and owing for brick furnished at the price agreed upon, with interest thereon as agreed, and to take all necessary proceeding for the collection thereof and may execute and deliver all proper receipts and vouchers therefor, the same as I might or could do were not this assignment made. It is understood that the First National Bank of Rome, New York, has an assignment prior to this to secure the payment of ten thousand dollars ($10,000). * * * The said city of Rome, its common council and chamberlain are hereby authorized and directed to pay to the said New York Brick and Paving Company the said sum of eleven thousand dollars ($11,000) out of the said moneys first due or to become due to me on said contract, subject to the rights of the said First National Bank of Rome, under the assignment above mentioned."

This was given and received in good faith as security for material, brick, to be furnished and used and which was thereafter furnished and used, to the full value of $11,000, in the performance of said contract.

On the 27th day of December, 1904, said the New York Brick & Paving Company filed in the proper office a notice of lien in due form "upon the moneys of the city of Rome applicable to construction of the public improvement" described therein, being the paving mentioned and described in the aforesaid contract. The amount of the lien claimed was $11,296.20, and the notice of lien contained the following:

"The amount claimed to be due is $11,296.20, for which said lienor has an assignment to the amount of $11,000.00, leaving a balance not covered by assignments of $296.20, with interest from November 1, 1904."

On the 6th day of September, 1904, said Cramond executed and delivered to the Medina Quarry Company, of Albion, N. Y., a third assignment of moneys to become due on such contract, to the amount of $3,475.00, to secure it for curbing stone to be delivered and used and which were thereafter, to the full value of $3,475, delivered and used in the execution and performance of such contract. This assignment was also given and received in good faith and duly filed in the proper office on the same day.

On the 28th day of December, 1904, said Medina Quarry Company filed a notice of lien "upon the moneys of the city of Rome, applicable to the construction of the public improvement" therein mentioned, the pavement in question, for the sum of $3,658.90, and interest on cer-

tain sums from certain specified dates, reciting the said assignment of moneys to become due on said contract to the amount of $3,475 thereof.

These notices of lien were in due form and properly executed and duly served. March 23, and 24, 1905, these lienors obtained from a judge of the Supreme Court, and duly filed same, with notice thereof, orders extending said liens, respectively, pursuant to the provisions of the lien law of the state of New York. The labor claimants whose rights are in question here have not, so far as appears, filed notices of lien pursuant to the statute of the state of New York, known as the lien law. On the 27th day of January, 1905, a petition in bankruptcy was filed in this court to have said Cramond adjudicated a bankrupt, and on the 28th day of January, 1905, he was adjudicated a bankrupt accordingly. Thereafter and on the 11th day of February, 1905, one M. H. Powers was duly appointed and qualified as trustee of the bankrupt's estate. He qualified February 16, 1905. The said contractor entered on the performance of the contract, soon after its execution and delivery, and completed it, substantially, employing labor on which he made payments, but a large number of laborers, 76 in number, were unpaid in full at the time of the bankruptcy. The total of these claims is over $1,018.64, all for labor performed for the contractor in the execution of the contract and on this paving work within the three months prior to the adjudication in bankruptcy. On the 19th day of December, 1904, the common council of the city of Rome adopted the following resolution: "Resolved that the paving of East Dominick street be accepted. That $100 be reserved for the cleaning of the streets in the city."

The contractor did not clean the streets, but the trustee in bankruptcy did, and on the 19th day of March, 1905, the city paid to the trustee the amount due on the contract with interest, in all $26,386.36. This was done pursuant to an order of the referee in bankruptcy that payment be made to the trustee, and the validity of that order was not questioned. The trustee has received from the other property of the bankrupt $622.79. The estate, $27,009.15, will not pay the expenses of administration and the amount of said assignments and liens and leave anything for the labor creditors. Or, if the expenses of administration and labor creditors, to the amount of $300 each, are paid and then the amount of the said assignments are paid, in order, the Medina Quarry Company will not be paid in full.

The question is: Shall any part of the $26,386.36 be applied to the payment of the costs and expenses of administration, including commissions, and to the payment of these labor claims, or of either, before paying the Medina Quarry Company in full? Has the bank a lien prior to the claim of these laborers?

February 27, 1905, the First National Bank of Rome filed its claim at $10,451.74, the New York Brick & Paving Co. filed its claim at $11,286.20, and the Medina Quarry Co. its claim at $3,658.90. The title of the trustee in bankruptcy, when appointed, relates back to the date of adjudication. Act July 1, 1898, c. 541, § 70, 30 Stat. 565, 566 [U. S. Comp. St. 1901, p. 3451]. He takes title to the property of the

bankrupt as it then was and subject to all valid liens thereon created more than four months prior to the filing of the petition. But this rule has no application to liens, whenever created, which, although valid as to the bankrupt, are invalid as to creditors. First National Bank of Baltimore v. Staake (U. S. Supreme Court No. 213, decided April 30, 1906) 26 Sup. Ct. 580, 50 L. Ed. ——. The court says:

"The rule that the trustee takes the estate of the bankrupt in the same plight as the bankrupt held it is not applicable to liens which, although valid as to the bankrupt, are invalid as to creditors."

The money due on this contract belonged to the estate in bankruptcy subject to all valid liens, if any, and was properly paid to the trustee, and it is his duty to administer it or pay it over to those entitled thereto pursuant to the order and direction of this court which has its custody for the purposes of administration and distribution. The various claimants have proved their claims, and it is the duty of the court to adjudicate their respective rights and priorities and establish all liens on the funds and determine their amount and direct their payment. I do not understand the law to be, or that the bankruptcy act contemplates, that the referee and trustee shall do this work without compensation in case it shall be determined that the liens on the funds of the estate, assuming that all are subject to liens are equal to or greater than such assets. Such a rule would require the officers of the court to spend time and money in caring for, protecting, and preserving the funds of the estate, subject to liens, for the benefit and profit of the lienors without compensation or reimbursement.

The court of bankruptcy is a court of equity (section 2 of the Bankrupt Act of July 1, 1898, c. 541, 30 Stat. 545, 546 [U. S. Comp. St. 1901, p. 3420]). and when it lawfully takes hold of and administers the estate of a bankrupt and has the funds in its possession for that purpose it may direct, and it is its duty to direct, that the lawful fees and commissions of its officers and expenses of such administration be paid therefrom, and when necessary, in such cases, liens on such funds must abate for this purpose.

Section 40 of the bankruptcy act (30 Stat. 556 [U. S. Comp. St. 1901, p. 3436]) expressly states:

"Sec. 40. Compensation of Referees.—(a) Referees shall receive as full compensation for their services, payable after they are rendered, a fee of fifteen dollars deposited with the clerk at the time the petition is filed in each case, except when a fee is not required from a voluntary bankrupt, and twenty-five cents for every proof of claim filed for allowance, to be paid from the estate, if any, as a part of the cost of administration, and from estates which have been administered before them one per centum commissions on all moneys disbursed to creditors by the trustee, or one-half of one per centum on the amount to be paid to creditors upon the confirmation of a composition."

Section 48 of the act (30 Stat. 557, 558 [U. S. Comp. St. 1901, p. 3439]) provides:

'Sec. 48. Compensation of Trustees.—(a) Trustees shall receive for their services, payable after they are rendered, a fee of five dollars deposited with the clerk at the time the petition is filed in each case, except when a fee is not required from a voluntary bankrupt, and from estates which they have

administered such commissions on all moneys disbursed by them as may be allowed by the courts, not to exceed six per centum on the first five hundred dollars or less, four per centum on moneys in excess of five hundred dollars and less than fifteen hundred dollars, two per centum on moneys in excess of fifteen hundred dollars and less than ten thousand dollars, and one per centum on moneys in excess of ten thousand dollars. And in case of the confirmation of a composition after the trustee has qualified the court may allow him, as compensation, not to exceed one-half of one per centum of the amount to be paid the creditors on such composition."

There is no suggestion that these commissions, etc., are confined to and must be computed on moneys disbursed to the general creditors by the trustee. In section 40 the language is "all moneys disbursed to creditors by the trustee" and in section 48 "all moneys disbursed by them as may be allowed by the courts." This pre-supposes, of course, that the money disbursed belonged to the estate of the bankrupt and was rightfully in the hands of the trustee for disbursement. Such funds may come into the possession of the court for this purpose in two ways: (1) By operation of law, and (2) by the consent or acquiescence of those interested therein. This position is founded in common sense and reason, and is supported not only by the express language of the act, but by authority. In re Sanford Furniture Mfg. Co., 11 Am. Bankr. Rep. 414, 126 Fed. 888; In re Sabine, 1 Am. Bankr. Rep. 322.

By the amendatory act of 1903 the words "all moneys disbursed to creditors by the trustee" were substituted for "sums to be paid as dividends and commissions" in section 40 of the original act, which provides for commissions to referees. By the same amendatory act the words "all moneys disbursed by them" were substituted for the words "sums to be paid as dividends and commissions" in section 48 of the original act, which provides for commissions to trustees. Here, as to trustees, there is no limitation to "moneys disbursed to creditors." The language covers, and evidently was intended to include, all moneys lawfully disbursed by the trustee, and held by him as such, whether to creditors, secured or unsecured or having priority, or to other persons. If to creditors it is immaterial whether the amounts lawfully paid them from the funds in court are paid as dividends or in satisfaction of a lien or liens on the fund. By section 1 of the act "creditor shall include any one who owns a demand or claim provable in bankruptcy." Secured claims are provable in bankruptcy, although allowable only to a certain amount. See section 57 of the act (30 Stat. 560, 561 [U. S. Comp. St. 1901, p. 3443]).

If the money comes lawfully into the hands of the trustee, as such, and, if he in the performance of his duty as such is required to protect, preserve, and care for it, and eventually disburse it pursuant to the order of the court, and does so, there is no reason why he should not have his commissions, if the court allows them, even if the funds are subject to a lien which in law and equity the court is required to recognize and enforce. It is true that in some cases the allowance and payment of these commissions may deplete, to that extent, the general fund applicable to the payment of dividends, while in others, as in this case, such allowance may deplete the amount applicable to the payment

of the liens. The act contemplates that secured creditors may and shall prove their claims, and they are to set forth "the claim, the consideration therefor, and whether any, and, if so what securities are held therefor," etc. Section 57, subd. a. Claims of secured creditors and those having priority may also be allowed for certain purposes, "but shall be allowed for such sums only as to the courts seem to be owing over and above the value of their securities or priorities." Section 57, subd. e.

This has reference to the allowance thereof for the purpose of fixing the sum on which a dividend from the general estate is to be paid and also of limiting the voting power or voice of the secured creditor, or creditor having a priority, at creditors' meetings. See section 56, which provides:

"Creditors shall pass upon matters submitted to them at their meetings by a majority vote in number and amount of claims of all creditors whose claims have been allowed and are present, except as herein otherwise provided."

It was not intended to prohibit the court in bankruptcy from determining the validity and amount of a lien on the funds lawfully in the hands of the court and trustee, as such, or to deprive the referee and trustee of their commissions fixed and allowed by the law, or by the court, as the case may be, when they respectively adjudicate upon, care for, protect, and preserve and disburse the fund in court.

The amendatory act of 1903 had a purpose, and it is expressed in unambiguous language. Subdivision h of section 57 provides the mode of determining the value of securities held by secured creditors, and when ascertained "the amount of such value shall be credited upon such claims and a dividend shall be paid only on the unpaid balance." If the value has been legally determined outside of the court of bankruptcy, it will take proof of and be governed by that fact, of course. The costs and expenses of administration, including the commissions of referee and trustee, will be paid from the funds in the hands of the trustee; the sum realized from sources outside the paving contract first being applied to that purpose, however.

As to the claims for labor, a more difficult proposition is presented. At the time of the execution and delivery of the assignments no money had been earned by Cramond on the contract. But it was all earned, the contract work all done, except work to the value of less than $50, to be done in cleaning the streets, and the material all furnished, prior to the 19th day of December, 1904, on which day the work was accepted, and more than 30 days prior to the filing of the petition in bankruptcy. The liability of the city to Cramond for the contract price, less $100, was fixed by the acceptance of the work on that day. It was to be paid within 90 days thereafter. When the liens of the New York Brick & Paving Company and of the Medina Quarry Company were filed, December 27 and December 28, 1904, respectively, the contract price of the work had been earned, the work accepted, and the liability of the city fixed, but Cramond was then insolvent. The liens of these two companies, created by filing their notice of liens, were obtained when the contractor, Cramond, was insolvent and

within the four months prior to the filing of the petition in bankruptcy and the adjudication following. The money was then due, within the fair meaning of the words of the assignments, although not payable. Buehler v. Pierce, 175 N. Y. 266–267, 67 N. E. 573.

The assignment then attached to the money earned and due under the terms of the contract. The lien on the fund was not "obtained in or pursuant to any suit or proceeding at law or in equity," or through legal proceedings. In re Emslie, 102 Fed. 291, 42 C. C. A. 350. These liens were not given with intent on the part of the bankrupt to hinder, delay, or defraud his creditors, or any of them. Nor is such a transfer or lien as this, created under such circumstances, held null and void as against creditors by the laws of the state of New York, but, on the other hand, is authorized by statute and held valid. Having filed notices of lien pursuant to law prior to the bankruptcy of Cramond and having continued these liens by an order of the court, it is clear that the New York Brick & Paving Company and the Medina Quarry Company have valid liens on the fund superior to the rights and liens of labor creditors who did not file notices of lien pursuant to the lien law of the state of New York. The filing of a notice of lien is necessary to the preservation and continuance of the lien or the right to a lien given by the statute as against those who having the right to a lien do file such notice. In other words, if several materialmen and laborers have liens or a right to liens, which are perfected and continued on filing the notice required by the statute, and all are on an equality prior to the filing of such notices, those who file the requisite notices of lien gain a priority over those who do not. The priority of such liens is determined by the date of filing. In re Kerby-Dennis Co., 95 Fed. 116, 36 C. C. A. 677; In re Emslie, 102 Fed. 291, 42 C. C. A. 350. But the First National Bank of Rome did not file any notice of lien. In fact it was not entitled to file a lien, as it was neither a laborer nor a materialman. Its right to an equitable lien and priority over the labor creditors rests in its assignment of the money to become due on the contract.

The labor creditors in question here, I am not referring to the few who did file liens, were entitled to a lien under section 5 of chapter 418, p. 517, Laws of New York, approved May 13, 1897, entitled "An act in relation to liens, constituting chapter forty-nine of the general laws," as amended by chapter 37, p. 74, Laws 1902, and which section reads as follows:

"Sec. 5. Liens Under Contracts for Public Improvements.—A person performing labor for or furnishing materials to a contractor, his sub-contractor or legal representative, for the construction of a public improvement pursuant to a contract by such contractor with the state or a municipal corporation, shall have a lien for the principal and interest of the value or agreed price of such labor or materials upon the moneys of the state or of such corporation applicable to the construction of such improvement, to the extent of the amount due or to become due on such contract, upon filing a notice of lien as prescribed in this article."

It will be noted that the lien is given "upon filing a notice of lien as prescribed in this article." That notice is provided for in section 12 of the act referred to, and the material part thereof reads as follows:

"Sec. 12. Notice of Lien on Account of Public Improvements.—At any time before the construction of a public improvement is completed and accepted by the state or by the municipal corporation, and within thirty days after such completion and acceptance, a person performing work for or furnishing materials to a contractor, his sub-contractor, assignee or legal representative, may file a notice of lien with the head of the department or bureau having charge of such construction and with the comptroller of the state or with the financial officer of the municipal corporation, or other officer or person charged with the custody and disbursements of the state or corporate funds applicable to the contract under which the claim is made."

Then follows a statement as to what the notice of lien shall contain. Section 17 of the same act provides for the duration of such a lien, and reads as follows:

Sec. 17. Duration of Lien Under Contract for a Public Improvement.—If the lien is for labor done or materials furnished for a public improvement, it shall not continue for a longer period than three months from the time of filing the notice of such lien, unless an action is commenced to foreclose such lien within that time, and a notice of the pendency of such action is filed with the comptroller of the state or the financial officer of the municipal corporation with whom the notice of such lien was filed, or unless an order be made by a court of record, continuing such lien, and a new docket be made stating such fact."

Section 20 of the act states when and how a lien for a public improvement is discharged, and, so far as material to the labor claims where a notice was filed, is as follows:

"Sec. 20. Discharge of Lien for Public Improvement.—A lien against the amount due or to become due a contractor from a municipal corporation for the construction of a public improvement may be discharged as follows: * * * (2) By lapse of time, when three months have elapsed since filing the notice of lien, and no action has been commenced to enforce the lien."

Those who did not file notices of lien under this statute have no lien on this fund by virtue of the statutes of the state of New York. Such persons had the right to a lien, but no lien until the prescribed notice was filed, etc.

The bankruptcy act, approved July 1, 1898, as amended by the act of February 5, 1903, creates no "lien," in the proper sense of the word, in favor of these labor claimants, but creates a priority in their favor as prescribed in section 64 of the act of July 1, 1898, c. 541, 30 Stat. 563 [U. S. Comp. St. 1901, p. 3447], which relates to "Debts which have priority." By it (subdivision a) taxes are first to be paid; by subdivision b "the debts to have priority," except as otherwise provided in the act, and "to be paid in full out of bankrupt estates, and the order of payment shall be": (1) Costs of preserving the estates; (2) filing fees, etc; (3) costs of administration; (4) "wages due to workmen, clerks and servants which have been earned within three months before the date of the commencement of proceedings not to exceed three hundred dollars to each claimant; and (5) debts owing to any person who by the laws of the states or the United States is entitled to priority."

By section 67 of the act, which deals with "Liens" in subdivision d, it is provided:

"(d) Liens given or accepted in good faith and not in contemplation of or in fraud upon this act, and for a present consideration, which have been

recorded according to law, if record thereof was necessary in order to impart notice, shall not be affected by this act." (30 Stat. 564 [U. S. Comp. St. 1901, p. 3449]).

But liens obtained by compliance with the provisions of the lien law of the state of New York are not "liens given or accepted," within the meaning of this subdivision. However, the general scope and purport of the act and of the section relating to liens are that all liens on property good at the time of the adjudication in bankruptcy as against the debtor and all his creditors, and not made void or voidable by some special provision, remain good and valid, and the trustee takes title subject thereto. In re New York Economical Printing Co., 110 Fed. 514, 49 C. C. A. 133, approved as to this point, Hewit v. Berlin Machine Works, 194 U. S. 296–302, 24 Sup. Ct. 690, 48 L. Ed. 986; Thompson v. Fairbanks, 196 U. S. 516–526, 25 Sup. Ct. 306, 49 L. Ed. 577.

In Thompson v. Fairbanks, supra, the court, at page 526 of 196 U. S., page 310 of 25 Sup. Ct. (49 L. Ed. 577), said:

"Under that law it was held that the assignee in bankruptcy stood in the shoes of the bankrupt, and that 'except where, within a prescribed period before the commencement of proceedings in bankruptcy, an attachment has been sued out against the property of the bankrupt, or where his disposition of his property was, under the statute, fraudulent and void, his assignees take his real and personal estate, subject to all equities, liens and incumbrances thereon, whether created by his act or by operation of law.' Yeatman v. Savings Institution, 95 U. S. 764, 24 L. Ed. 589. See, also, Stewart v. Platt, 101 U. S. 731, 25 L. Ed. 816; Hauselt v. Harrison, 105 U. S. 401, 26 L. Ed. 1075. Under the present bankrupt act, the trustee takes the property of the bankrupt, in cases unaffected by fraud, in the same plight and condition that the bankrupt himself held it, and subject to all the equities impressed upon it in the hands of the bankrupt, except in cases where there has been a conveyance or incumbrance of the property which is void as against the trustee by some positive provision of the act. In re Garcewich, 115 Fed. 87, 89, 53 C. C. A. 510, and in cases cited."

Without further discussion, assuming this to be so, it only remains to determine whether or not the First National Bank of Rome, by virtue of its assignment of the moneys to come due on the contract between Cramond and the city of Rome, and the advancement of money and the performance of the contract and the acceptance of the work by the city, acquired a lien on the fund superior to the right to priority of payment given by section 64 to labor creditors having no other lien. And this question, it seems to me, depends on the question whether the bank had an equitable lien that had attached to the fund, the money due from the city to Cramond on the contract, at the date of the adjudication, and which was neither void nor voidable under any provision of the bankruptcy law. I think it had such a lien. It had advanced the money to Cramond from time to time to enable him to perform the contract. This money had gone into material or labor put into the work and the fund due from the city, to an extent, represented, or was created, by these advances. The money was advanced in good faith on the strength of the assignment which contained an order and direction to the city, or its proper fiscal officers, to pay it to the bank. The assignment was duly filed and recorded with the city chamberlain, and the city therefore had notice. Cramond

reserved to himself no right in the money, nor any control over it, or right to revoke the assignment. The principle is well recognized and established in the courts of the United States as well as in those of the states. Peugh v. Porter, 112 U. S. 737, 5 Sup. Ct. 361, 28 L. Ed. 859; Wright v. Ellison, 1 Wall. (U. S.) 16, 17 L. Ed. 555; Trist v. Child, 21 Wall. (U. S.) 441–447, 22 L. Ed. 623; Christmas v. Russell, 14 Wall. (U. S.) 69–84, 20 L. Ed. 762; Hall v. City of Buffalo, *40 N. Y. 193–199; Parker v. City of Syracuse, 31 N. Y. 376–379; Lowery v. Steward, 25 N. Y. 239–242, 82 Am. Dec. 346; Brill v. Tuttle, 81 N. Y. 454, 37 Am. Rep. 515; Dannat v. Comptroller of City of N. Y., 77 N. Y. 45; Gibson v. Lenané, 94 N. Y. 183. It is unnecessary to cite cases in other states. Here the assignment was absolute and the direction to pay absolute and unconditional.

That the right of the assignee, the First National Bank of Rome, was superior to that of the laborers who filed no notice of lien is well settled. Stevens v. Ogden, 130 N. Y. 182, 29 N. E. 229; Lauer v. Dunn, 115 N. Y. 405, 22 N. E. 270; Conselyea v. Blanchard, 103 N. Y. 233, 8 N. E. 490; Brill v. Tuttle, 81 N. Y. 454, 37 Am. Rep. 515; McCorkle v. Herrman, 117 N. Y. 297, 22 N. E. 948.

In Trist v. Child, supra, the court, at page 447 of 21 Wall. (22 L. Ed. page 623), said:

"It is well settled that an order to pay a debt out of a particular fund belonging to the debtor gives to the creditor a specific equitable lien upon the fund, and binds it in the hands of the drawee. A part of the particular fund may be assigned by an order, and the payee may enforce payment of the amount against the drawee. But a mere agreement to pay out of such fund is not sufficient. Something more is necessary. There must be an appropriation of the fund pro tanto, either by giving an order or by transferring it otherwise in such a manner that the holder is authorized to pay the amount directly to the creditor without the further intervention of the debtor."

In Christmas v. Russell, supra, the court held:

"A mere promise, though of the clearest and most solemn kind, to pay a debt out of a particular fund, is not an assignment of the fund even in equity. To make an equitable assignment there should be such an actual or constructive appropriation of the subject-matter as to confer a complete and present right on the party meant to be provided for, even where the circumstance does not admit of its immediate exercise. If the holder of the fund retain control over it, as ex gr., power on his own account, to collect it or to revoke the disposition promised, this is fatal to the thing as an equitable assignment."

In Peugh v. Porter, supra, the court held:

"An instrument, by which A., as attorney in fact by substitution, for good consideration, assigns to B. an interest in claims to be established against a foreign government in a mixed commission, is valid in equity, although made before the establishment of the claim, and creation of the fund, and may work a distinct appropriation of the fund in B's favor to the extent of the assignments, within the rule laid down in Wright v. Ellison, 1 Wall. 16. 17 L. Ed. 555."

In Stevens v. Ogden, supra, the court held:

"Under the mechanic's lien law of 1885 (chapter 342, p. 585, Laws 1885), the filing of the prescribed notice originates the lien, and until this is done the laborer or materialman has no preferential right to be paid out of the sum due the contractor from the owner of the building. If, before notice is

145 F.—62

filed, the contractor assigns to a creditor in payment of his debt, the whole or any portion of the moneys due or to become due to him on his contract, the assignor is entitled to the same in preference to the lienor."

In McCorkle v. Herrman, supra, the court held:

"Under the mechanic's lien law of 1885 (Laws 1885, p. 587, c. 342), one who has furnished labor or materials in the erection of a building has, prior to the filing of his notice of lien, no preferential right to be paid for his labor or materials out of a sum due from the owner of the building to the contractors, but stands in the same position as other creditors; and if, before he has filed his lien, another creditor, pursuing the usual remedies for the collection of debts, has acquired a legal or equitable right to have the debt applied in satisfaction of his claim, this right is not overreached by liens subsequently filed under said act, save where priority is given by the provisions of the act (section 5)."

These same remarks apply as to the rights of the New York Brick & Paving Company and the Medina Quarry Company, and under them they, under the authorities quoted, are prior to the labor lien creditors who actually filed liens. As each assignee subsequent to the bank took its assignment subject to the prior assignments they will be paid in order of filing and recording.

Since the decision of Whitney, as Trustee, etc., v. Wenman et al., 198 U. S. 539–552, 25 Sup. Ct. 778, 49 L. Ed. 1157, there is no question of the power and jurisdiction of this court to determine all of these questions. The court there said and held:

"We think the result of these cases is, in view of the broad powers conferred in section 2 of the bankrupt act, authorizing the bankruptcy court to cause the estate of the bankrupt to be collected, reduced to money and distributed, and to determine controversies in relation thereto, and bring in and substitute additional parties when necessary for the complete determination of a matter in controversy, that when the property has become subject to the jurisdiction of the bankruptcy court as that of the bankrupt, whether held by him or for him, jurisdiction exists to determine controversies in relation to the disposition of the same and the extent and character of liens thereon or rights therein. This conclusion accords with a number of well-considered cases in the federal courts. In re Whitener, 105 Fed. 180, 44 C. C. A. 434; In re Antigo Screen Door Co., 123 Fed. 249, 59 C. C. A. 248; In re Kellogg, 121 Fed. 333, 57 C. C. A. 547."

It may be well to remark that in my opinion subdivision 5 of section 64 of the bankruptcy act has no reference to liens actually existing at the time of the adjudication. Liens on the property of the bankrupt, not void or voidable under some provision of the law, whether obtained and created by express contract or by virtue of compliance with the lien law of a state, since the amendment to the act, are first to be paid (excepting taxes) subject to abatement for commissions expressly allowed to referees and trustees on all sums disbursed to creditors in the one case and to any one in the other. While all liens are, in a sense, priorities, and certain priorities may be liens, in a sense, still all priorities are not liens, and in my opinion clause 5 of subdivision b of section 64 does not refer, and was not intended to refer to liens on the estate of the bankrupt. It was assumed that valid liens would be paid, and that the debts and expenses, etc., designated to have priority would have priority of payment out of the estate after liens were satisfied, or out of the proceeds of the property if sold sub-

ject to liens. Since the striking out of the words "sums to be paid as dividends and commissions," in section 48, and the substitution of the words "on all moneys disbursed by them," and a similar change in section 40 by the amendment of 1902, these commissions when necessary to be paid from funds subject to the liens, and which payment causes an abatement of the lien to that extent, gain the priority over liens by virtue of the reading of sections 40 and 48 as amended, which sections now limit or modify subdivision b of section 64, and not by virtue of the reading of section 64. No corresponding amendment was made in section 64 of the act as it was not regarded necessary. The directions of sections 40 and 48 are plain and explicit, and must be read in connection with section 64. Only in exceptional cases does the necessity for applying the modification arise. I think it also clear that, should a case arise where a laborer has acquired a lien by virtue of the state lien law for wages earned within the three months before the commencement of proceedings, even should such lien largely exceed $300, he would hold his lien and be entitled to full payment thereof notwithstanding clause 4 of subdivision b of section 64.

The question is presented that, under section 13 of the lien law of the state of New York (section 13 of chapter 418, p. 520, Laws 1897, not amended), the lien of laborers for daily or weekly wages has a preference over the lien of materialmen, or those not working for daily or weekly wages. The closing subdivision of section 13, which relates to "Priority of Liens," reads:

"Persons standing in equal degrees as colaborers or materialmen, shall have priority according to the date of filing their respective liens; but in all cases laborers for daily or weekly wages shall have preference over all other claimants under this article, without reference to the time when such laborers shall have filed their notices of liens."

As this section does not profess to deal with liens on account of public improvements, it may be questioned whether this clause applies in such cases, but, still, the words are "over all other claimants under this article" and claimants having liens on account of public improvements are certainly "claimants under this article," which is article 1, relating to mechanics' liens, of chapter 49 of the General Laws. It is not necessary to expressly decide the question here as the liens of the First National Bank, the New York Brick & Paving Company, and the Medina Quarry Company do not arise under, and were not created by, the lien law of New York, but by virtue of their assignments, respectively, and they are not claimants under the article in question, and the estate, including the paving fund in question, is not sufficient to pay those liens and the costs and expenses of administration, including commissions, and leave anything for the claimants under the lien law of the state of New York. For the same reason it is not necessary to decide as to the effect of the failure of certain of the claimants under the lien law of New York, bankruptcy having intervened, to obtain an order of the court extending and continuing their liens pursuant to section 17 of that law as amended. These are interesting, but, as the case stands, not practical questions here. It is not necessary to decide as to the priority among themselves of the liens filed under the lien law of the state of New York.

Something has been said as to the effect of advances of money, etc., made under and pursuant to the assignments during the three months immediately preceding the commencement of the bankruptcy proceedings. True some of these advances were made after Cramond became, in fact, insolvent, but the assignees did not know this fact and had no reasonable ground to so believe. In fact I cannot see that it would affect their liens in the slightest degree had they had full knowledge of this fact. They had already taken and filed and recorded their assignments and in good faith made large advances of money and material, respectively. To have ceased to furnish money and material according to the agreement, after Cramond became insolvent, would have resulted in the suspension of work, failure to perform the contract, and the consequent loss of all they had put into the work. These laborers are unfortunate, but I see no way to give them priority over the holders of these assignments of the fund without doing violence to the law as I feel compelled to construe it.

The order of the referee is so far modified that payment and distribution of the funds in the hands of the trustee not derived from the paving contract will be made as follows: (1) Taxes if any; (2) the actual and necessary cost of preserving the estate subsequent to filing the petition, if any; (3) the cost of administration including fees of witnesses and one reasonable attorney fee to the bankrupt as the court, referee, may allow; and then commissions to the referee and trustee computed on all sums disbursed, including the paving contract fund, as specified in sections 40 and 48 of the bankruptcy act and construed by this opinion, so far as such fund will pay same. Should such fund, not including the paving fund, pay such specified sums and such commissions so computed in full and leave a balance, such balance will be paid to the workmen, clerks, or servants of the bankrupt earned by them within the three months prior to the commencement of the bankruptcy proceeding, pro rata, but not exceeding $300 to each claimant. Payment and distribution of the moneys received from the city of Rome on the paving contract will be made as follows: (1) To the referee and trustee any balance of commissions computed on both funds as stated not paid from the fund first mentioned; and (2) to the said First National Bank of Rome, the New York Brick & Paving Company, and the Medina Quarry Company in satisfaction of their liens under their respective assignments of an interest in the fund, as the same may be established as to amount by the referee, in the order named, and in the order of the assignments. In case there is a surplus of this fund, it will be paid to labor claimants who have filed liens as their rights and priorities thereunder may appear.

There will be an order accordingly.