ATCHISON, T. & S. F. RY. CO. et al. v. HURLEY et al.

(Circuit Court of Appeals, Eighth Circuit.   March 20, 1907.)

No. 2,424.

1. BANKRUPTCY—NATURE OF PROCEEDINGS—PROTECTION OF EQUITABLE RIGHTS.
    The administration and distribution of the property of bankrupts is a proceeding in equity, and should be conducted on broad equitable lines, with a view of recognizing and enforcing the rights of all parties claiming an interest in the estate, whether they be legal or equitable or both.

2. SAME.
    A trustee in bankruptcy stands in the shoes of the bankrupt, and whatever rights a third party had against the property of the bankrupt before adjudication that party, in the absence of fraud or fixed liens created by state statutes in favor of others, has against his estate in bankruptcy.

3. FRAUDS, STATUTE OF—OPERATION OF STATUTE—CONTRACT AS GROUND FOR EQUITABLE RELIEF.
    Equity will not permit the statute of frauds to be invoked in favor of a party who has not performed his oral undertaking against one who, at his invitation and in reliance on his promise, has expended money and changed his situation.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Frauds, Statute of, § 343.]

4. BANKRUPTCY—ASSUMPTION OF CONTRACT BY TRUSTEE.
    While trustees in bankruptcy are not bound to accept property or take over contracts which are onerous and unprofitable, they are required to elect whether to assume an existing executory contract and to continue its performance and ultimately dispose of it for the benefit of the estate, or to renounce it, and leave the injured party to such legal remedies for the breach as the case affords. If they elect to assume a contract, they

take it cum onere, as the bankrupt held it, subject to all of its provisions and conditions, and any valid modification of a written contract which may have been made by the bankrupt before adjudication, whether oral or in writing, and whether known or unknown to the trustees, will be binding upon them.

5. SAME—ENFORCEMENT OF EQUITABLE LIEN.

The owners of coal lands entered into a contract by which they leased the same, and by which the lessee engaged to supply to a railroad company all of the coal required on certain lines of its road at stated prices, the company, on its part agreeing to pay for the coal delivered during each calendar month on the 15th of the following month. The railroad company was given power to terminate the lease on a failure of the lessee to comply with such contract, and the lease was made assignable only with its consent. The lease was assigned to a coal company which fulfilled the contract for a number of years. Becoming short of money, the railroad company advanced it money to meet its pay rolls under an oral agreement that the advances should be repaid by the subsequent delivery of coal under the contract. While still owing such advances, the coal company was adjudicated a bankrupt, and its receivers and subsequently its trustees continued to deliver coal under the contract, but refused to allow the advances. *Held*, that the oral agreement was in effect a waiver by the railroad company of its right to withhold.payment until after delivery, and the advances constituted a payment in advance for coal to be delivered under the contract and a pledge of the coal when mined, which was valid as against the bankrupt and its trustees, who had assumed and continued performance of the contract.

Hook, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Kansas.

Robert Dunlap (Wm. R. Smith and Gardiner Lathrop, on the brief), for appellants.

John S. Dean, for appellees.

Before SANBORN, HOOK and ADAMS, Circuit Judges.

ADAMS, Circuit Judge. This was an appeal from an order of a court of bankruptcy in the district of Kansas denying to the Atchison, Topeka & Santa Fé Railway Company a claim for a preference against the assets of Mt. Carmel Coal Company, bankrupt, or the alternative relief prayed for.

In 1896 the Osage Carbon Company and the Cherokee & Pittsburg Coal & Mining Company, as parties of the first part, Charles J. Devlin, as party of the second part, and the railway company, as party of the third part, entered into an agreement whereby the parties of the first part leased, for certain rents and royalties reserved, to Devlin for a term of three years certain coal lands situate in the state of Kansas with the right to mine coal therefrom, and the party of the second part agreed to sell and deliver to the railway company and the latter to buy from him daily all the coal required by it in the operation of certain of its lines of railroad in the state of Kansas, at the prices stated in the lease, the same to be paid for by the railway company on the 15th day of each month for all coal delivered to it during the preceding calendar month. Power was conferred upon the railway company to terminate the lease for failure by Devlin to perform any of

his undertakings, and the right to assign the lease was made subject to the consent of the railway company. Subsequently Devlin duly assigned to the Mt. Carmel Coal Company all his rights under the lease. By two successive agreements between the latter company and the other parties to the lease the same was extended with slight modification, unimportant now to mention, subject to all its original terms and conditions, until June, 1906. All the parties continued in the performance of their respective obligations until July, 1905, when the Mt. Carmel company was adjudicated a bankrupt. Receivers were duly appointed and authorized to conduct the business of the bankrupt in the usual course, until trustees should be chosen. The receivers and subsequently appointed trustees successively continued to operate the mines under orders of the court, and, in the language of the court below, "performed fully the terms of the contract as it is written with the coal company and the railway company." While the receivers were in charge the railway company and the two coal companies, the original lessors, filed their joint intervening petition, setting forth their relations with the bankrupt under the contract of 1896 as extended, their rights thereunder as already stated, and, in substance, that by an agreement had between them and the bankrupt the contract had been modified to the extent that the railway company had agreed that, without waiting until the 15th day of the month to make its payment for coal theretofore purchased, it would, in order to accommodate the bankrupt and enable it to pay off laborers and keep the mines going, make advance payments from time to time when necessary for those purposes for coal thereafter to be delivered under and pursuant to the terms of the contract; that pursuant to that agreement and for the purposes stated it had advanced $57,304.16 to the bankrupt with the understanding that it should be repaid by the delivery of coal under the contract, during the months of July and August, 1905; that the intervening bankruptcy proceedings of July 7th and the appointment of the receivers by the court alone prevented the bankrupt from carrying out its obligation and delivering the requisite coal to it.

The petitioners prayed that the lease be declared forfeited and void and the mines delivered back to them, or that the receivers be directed to deliver to the railway company the amount of coal so paid for in advance by it. The intervening petition was referred to a referee who heard the proof and reported unfavorably to granting any relief, and his report was afterwards confirmed by the district judge and the petition dismissed. The facts are not materially controverted.

The referee found and reported the amount claimed by the railway company, $57,304.16, had been advanced in the way shown by the proof, to enable the bankrupt to meet its pay rolls. He concluded as follows:

"I am unable to find any testimony indicating an intention to modify the written lease. There certainly was no express oral agreement to that effect. It is true the advances were to be paid, by money due the coal company for coal furnished the Santa Fé Company, and the money, instead of being paid under the terms of the written contract, would be kept to reimburse the Santa Fé Company for money advanced."

The court in reviewing the action of the referee said:

"True, at the time the sums of money were advanced it was no doubt contemplated and agreed by the parties that the bankrupt would repay the money by furnishing coal at the price of the coal measured in money by the terms of the contract and would furnish such coal in July and August as claimed, but at the time of the failure of the bankrupt the coal remained in the ground unmined."

From these facts the referee concluded that the verbal agreement was a separate independent parol contract, and had nothing to do with the original contract as evidenced by the lease, and the court in affirming the referee's conclusion observed as follows:

"I am of opinion that the transactions by which the money was advanced by the treasurer of the railway company to the bankrupt were completed transactions by reason of which the bankrupt became indebted to the railway company for so much money and that such transactions are wholly independent of and separate and apart from the originl contract between the parties. * * * The contracts under which the money was advanced created no lien upon any property for its repayment. * * *"

The supplemental agreement whereby provision was made for advance payments for coal to be thereafter delivered under the lease may or may not be properly called a modification of the original agreement. That is immaterial. What we are concerned about is not its name, but its meaning; that is, what was the intent and purpose of the parties in making it. In arriving at such intent and purpose we should consider the situation of the parties and the facts and circumstances surrounding them in the light of which, and to effect which, the supplemental agreement was made. The clear intent and purpose of the main contract, so far as the railway company is concerned, was to make a reliable provision in advance for its daily necessities for a period of years—a provision so important to the railway company itself and to the traveling public that it saw fit to secure and make it certain by stipulations giving it the right to veto any assignment of the lease or to declare a forfeiture of all the coal company's rights under the lease if it failed to observe its contract obligations. It appears that the coal company, while the contract was still in force and being executed, became embarrassed and unable to meet its pay rolls. As a result it might not be able to mine or deliver the coal which it had agreed to mine and deliver to the railway company, and which the latter imperatively required for its daily consumption. In this state of things the railway company agreed to waive its right to withhold payment for 15 days after coal was delivered to it and pay for some of it before it was delivered; and the coal company agreed, as found by the trial court, to repay such advances, not in money, but by furnishing coal in the months of July and August following at the price fixed by the original contract. This arrangement made when the coal company was in embarrassed circumstances, and obviously inspired by the necessity of meeting the pay rolls, and for the ultimate purpose of securing performance of the only part of the original contract in which the railway company was interested, namely, securing its supply of coal, is so intimately and vitally related to the original contract that we are unable to agree

with the trial court that it was intended to be independent and separate from it. It was not, in our opinion, a modification of any of the substantive provisions of the contract, but was a change rendered necessary by subsequent events in the method of its execution only. It was an arrangement in no manner inconsistent with any of the provisions of the original contract, but only in aid of its execution.

The contract after the new arrangement remained as before. The coal company still had a right to mine coal on the same terms and conditions as before, and was bound to supply the daily needs of the railway company as before. The money paid in advance entitled the railway company to an amount of coal which the money so advanced would pay for according to the terms of the original contract. We think the inevitable meaning of the new arrangement, interpreted in the light of the conditions surrounding the parties and as necessarily intended by them, was to set apart a sufficient amount of coal after it should be mined as security for the payment of advances made. This result is not expressed in the conventional form of a mortgage or pledge, but the method of producing it was devised for the purpose of acquiring the needed money by the coal company and of furnishing security for its repayment. If the parties intended the arrangement to be one for borrowing and securing the repayment of money, we ought, as between them, to so regard it and to treat it as creating an equitable charge or lien, however inartificially it may have been expressed. We cannot conceive it possible that the railway company, with all the machinery for self-protection and security afforded by the original contract, would, when the coal company became embarrassed financially, surrender that protection and security and voluntarily loan to the insolvent money to produce its coal without any security whatsoever. Accordingly we cannot agree with the learned trial court that the parties intended the advances to be independent transactions disconnected from the original lease and resulting only in simple contract debts or unsecured loans to the coal company. On the contrary, we think, as already stated, that the parties intended to appropriate and secure to the railway company sufficient coal when mined to repay the advances made by it.

In the case of Fourth Street Bank v. Yardley, 165 U. S. 634, 17 Sup. Ct. 439, 41 L. Ed. 855, the facts were that the Keystone Bank solicited and received from the Fourth Street Bank $25,000 of gold certificates, agreeing to give its check against its reserve in the Tradesmen's National Bank therefor. Instead of doing so, it gave in the execution of the transaction a check against its general account in the last-mentioned bank. The draft was duly presented for payment, and payment was refused. It was held in the case which was brought to subject moneys in the hands of the receiver of the Keystone Bank to an equitable charge or lien in favor of the Fourth Street Bank that, inasmuch as it was the intention and agreement of the parties that the check drawn generally should be paid out of a particular fund, such check, as between the parties, should be treated as an equitable assignment of that fund to the extent necessary to pay the check. In its opinion the Supreme Court made the following observations:

"When we look at the situation of the parties and the character of the transaction disclosed by the facts just referred to, no difficulty is experienced in ascertaining the intent of the parties. Both were banking institutions—banks of deposit. They were located in the same city. * * * It cannot be doubted that a mere request for the loan by the Keystone Bank from the Fourth Street Bank would have been so surprising that the contract would not possibly have been made without a statement of the reason which rendered the request necessary. * * * The deduction arises that, as it cannot be reasonably conceived that the loan would have been made without reference to an assignment of the particular fund from which alone the hope of immediate payment was to be reasonably expected, the parties must have and did intend to create a particular appropriation, charge, or lien on the property upon the faith of which they both dealt. * * * It is, of course, true that the method adopted to evidence the appropriation [by the Keystone Bank] was a check drawn generally upon the Tradesmen's Bank, but, as already stated, the authorities are clear that, when it is established that it was the intention and agreement of the parties to a transaction that a check drawn generally should be paid out of a particular fund, such check, as between the parties, will be treated as though an order for payment out of a specific, designated fund."

To the same effect are the following cases: Hauselt v. Harrison, 105 U. S. 401, 26 L. Ed. 1075; Carr v. Hamilton, 129 U. S. 252, 9 Sup. Ct. 295, 32 L. Ed. 669; Duplan Silk Co. v. Spencer, 53 C. C. A. 321, 115 Fed. 689; Erie R. C. v. Dial, 72 C. C. A. 183, 140 Fed. 689; In re Cramond (D. C.) 145 Fed. 976; Reeves v. Kimball, 40 N. Y. 299.

The foregoing are sufficient to show how far the courts have gone in declaring transactions, not made strictly in the conventional language of a mortgage or pledge, to be equitable charges in the nature of such mortgage or pledge, when it is necessary to do so in order to execute the intent and purpose of the parties.

It follows that, if bankruptcy had not supervened, the railway company could have enforced its claim for advantages against the coal when mined by the coal company. Does the bankruptcy of the latter company deprive the former of the same remedy against the trustees? The administration and distribution of the property of bankrupts is a proceeding in equity (In re Rochford, 59 C. C. A. 388, 124 Fed. 182), and should be conducted on broad equitable lines, with a view of recognizing and enforcing the rights of all parties claiming an interest in the estate, whether they be legal or equitable, or both. In re Chase, 59 C. C. A. 629, 124 Fed. 753. The last cited case well expresses the broad and liberal spirit which pervades the bankruptcy act. It is there said by Circuit Judge Putnam, in delivering the unanimous opinion of the Circuit Court of Appeals of the First Circuit, as follows:

"It is settled that a trustee in bankruptcy has no equities greater than those of the bankrupt, and that he will be ordered to do full justice, even in some cases where the circumstances would give rise to no legal right, and, perhaps, not even to a right which could be enforced in a court of equity as against an ordinary litigant. Williams' Law of Bankruptcy (7th Ed.) 191. Indeed, bankruptcy proceeds on equitable principles so broad that it will order a repayment when such principles require it, notwithstanding the court or the trustee may have received the fund without such compulsion or protest as is ordinarily required for recovery in the courts either of common law or chancery."

See to the same effect the following cases: Hutchinson v. Le Roy, 51 C. C. A. 159, 113 Fed. 202, 205; Hutchinson v. Otis, 53 C. C. A. 419, 115 Fed. 937, 940; Batchelder & Lincoln Co. v. Whitmore, 122 Fed. 355, 58 C. C. A. 517.

The trustees stand in the shoes of the bankrupt. Whatever rights a third party had against the property of a bankrupt before adjudication, that party, in the absence of fraud or fixed liens created by state statutes in favor of others, has against his estate in bankruptcy. Hewit v. Berlin Machine Works, 194 U. S. 296, 24 Sup. Ct. 690, 48 L. Ed. 986; Thompson v. Fairbanks, 196 U. S. 516, 25 Sup. Ct. 306, 49 L. Ed. 577; Humphrey v. Tatman, 198 U. S. 91, 25 Sup. Ct. 567, 49 L. Ed. 956; York Mfg. Co. v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782.

In Thompson v. Fairbanks, the Supreme Court said:

"Under the present bankrupt act, the trustee takes the property of the bankrupt, in cases unaffected by fraud, in the same plight and condition that the bankrupt himself held it, and subject to all the equities impressed upon it in the hands of the bankrupt, except in cases where there has been a conveyance or incumbrance of the property which is void as against the trustee by some positive provision of the act."

In the light of these authorities we have no hesitation in holding that the equitable charge created by the parties before the bankruptcy of the coal company should be enforced against the estate in the hands of its trustees.

Counsel for the trustees contend that no lien, equitable or otherwise, was created by the subsequent agreement, because it was not in writing and signed by the parties to be charged as required by section 3173, Gen. St. Kan. 1901, commonly known as the "statute of frauds." We find it unnecessary to consider the interesting question debated at the bar whether the oral agreement was such a substantive modification of the original one as distinguished from a change in detail of performance, as required it to be in writing to conform to the statute in question. It sufficiently appears that the railway company fully performed its part of the agreement. It advanced the money as agreed, but the coal company failed to repay it as agreed. Equity will not permit the statute of frauds to be invoked in favor of a party who has not performed his oral undertaking against one who, at his invitation and in reliance upon his promise, has expended money and changed his situation. That would make the statute an instrument of fraud rather than a means to prevent it. It cannot be so employed. Swain v. Seamens, 9 Wall. 254, 19 L. Ed. 554; Brown on Stat. of Frauds, §§ 457–460; Glass v. Hulbert, 102 Mass. 24, 36, 3 Am. Rep. 418; Suggett's Adm'r v. Carson's Adm'r, 26 Mo. 221; Winters v. Cherry, 78 Mo. 344, 349.

Another and conclusive answer to the trustees' contention in this case is found in their conduct on assuming the duties of their trust. They found an assignable executory contract in force between the bankrupt and the railway company—one that might be advantageous or disadvantageous to the estate. It was evidenced by writing, but the parties had changed its mode of performance as already

pointed out, so that as between them it consisted of the original instrument and the agreed modification.

It is well settled that trustees in bankruptcy are not found to accept property or take over contracts which are onerous and unprofitable, and which would burden, rather than benefit, the estate. In the execution of their trust they are confronted at the outset with the duty of electing whether to assume an existing executory contract, continue its performance, and ultimately dispose of it for the benefit of the estate or to renounce it and leave the injured party to such legal remedies for the breach, as the case affords. American File Co. v. Garrett, 110 U. S. 288, 295, 4 Sup. Ct. 90, 28 L. Ed. 149; Sparhawk v. Yerkes, 142 U. S. 1, 13, 12 Sup. Ct. 104, 35 L. Ed. 915; Sessions v. Romadka, 145 U. S. 29, 12 Sup. Ct. 799, 36 L. Ed. 609; Dushane v. Beall, 161 U. S. 515, 16 Sup. Ct. 637, 40 L. Ed. 791; Watson v. Merrill, 69 C. C. A. 185, 136 Fed. 359, 363; In re Chambers, Calder & Co. (D. C.) 98 Fed. 865; Mercantile Trust Co. v. Farmers' Loan & Trust Co., 26 C. C. A. 383, 81 Fed. 254; Central Trust Co. v. Continental Trust Co., 30 C. C. A. 235, 86 Fed. 517.

If they elect to assume such a contract, they are required to take it cum onere, as the bankrupt enjoyed it, subject to all its provisions and conditions, "in the same plight and condition that the bankrupt held it." York Mfg. Co. v. Cassell, supra, and cases supra.

Any valid modifications of a written contract which may have been made by the bankrupt before adjudication, whether oral or in writing, and whether known or unknown to the trustees, are binding upon them if they elect to assume and perform the contract. They take it subject to all equities between the original parties. Reeves v. Kimball, supra; Wood v. Donovan, 132 Mass. 84; Homer v. Shaw, 177 Mass. 1, 58 N. E. 160; Mangles v. Dixon, 3 House of Lords Cases, 703. The duty rests upon the trustees to make inquiry and ascertain the true nature, character, and conditions of the contract before exercising their election. When the election is made to assume it where no fraud has been practiced upon them, they stand in exactly the same situation as the bankrupt himself stood prior to the adjudication. Cases, supra.

After presumably making all the inquiries necessary to fully acquaint themselves as to the advisability of taking over the executory contract in question the trustees in this case determined to do so, assumed the contract, and entered upon its execution. They mined coal, delivered it to the railway company, and, in the language of the trial court, "performed fully all the terms of the contract as it was written," but failed to conform to the condition created by the oral agreement to deliver coal to the railway company in payment of the advances made by it to keep the mine going.

From the foregoing the conclusion follows that the learned trial court should have sustained the interveners' petition and surrendered to them the leased premises or required the trustees, upon the assumption of the lease, to perform the condition of mining and furnishing the railway company sufficient coal to cover its advances. Not having done so and the lease having expired so that it cannot now be done, the assets of the estate, consisting in part of money

received for coal delivered to the railway company, should be subjected to the payment of such advances as a preferential claim.

The decree is accordingly reversed, and the cause remanded, with instructions to proceed according to this opinion.

HOOK, Circuit Judge, dissents,