# CHARLESTON

## MOORE v. TEARNEY.

Submitted September 10, 1906.    Decided April 18, 1907.

1. FRAUDULENT CONVEYANCE—*Creditors*—*Deeds*—*Failure to Record*—*Effect.*

   The class of creditors intended to be protected by section 3103, Code 1906, against an unrecorded deed are not "general creditors", but such creditors as have a lien upon or a right to charge with their debts or demands the property conveyed by such deed. (p. 75.)

2. SAME—*Evidence.*

   The declarations and acts of grantor, remaining in possession of the real estate conveyed, inconsistent with the conveyance—such as representing it as his own, managing, controlling and exercising acts of ownership thereof the same as he had done before the conveyance, having the same charged on the tax books in his own name and paying the taxes thereon, insuring the buildings in his own name and for his own use, paying no rent and taking all the profits and issues from the lands, and holding himself out to the community as the owner thereof as though no conveyance had been made, and where the grantee has withheld such conveyance from recordation and permitted the grantor to so use and treat such property as his own—constitutes strong badges of fraud in the conveyance. (p. 84.)

Appeal from Circuit Court, Jefferson County.

Bill by Gerrard D. Moore and S. W. Washington, trustees

in bankruptcy of J. Garland Hurst, against Joseph F. Tearney and others. Decree for defendants, and plaintiffs appeal.

*Reversed. Remanded.*

D. C. Westenhaver, Faulkner, Walker & Woods, Joseph Trapnell, and Benj. Trapnell, for appellants.

Forest W. Brown and R. T. Barton, for appellees.

McWhorter, Judge:

J. Garland Hurst of Jefferson county had been sheriff of said county and had become involved to insolvency. On the 4th day of December, 1896, he conveyed by two deeds of that date his farm, consisting of two contiguous tracts of land near Duffields in said county, for the consideration of $8,000 cash and his house and lot in the town of Harpers Ferry, occupied by himself as a residence, in consideration of $6,000 cash to his father-in-law, Edward Tearney, a man of considerable wealth who was on his bond as sheriff. On the same day the deeds were made to Tearney the latter gave Hurst a check for $15,000, being $1,000 more than the consideration mentioned in the deeds. The deeds were by Tearney placed in his safe at his home and kept there until his death which occurred in March, 1902. By his will Tearney appointed his sons Joseph F. Tearney, E. M. Tearney and Geo. L. Tearney his executors. After the death of Tearney his executors found the two deeds in the safe and called the attention of Hurst to them who requested that they should not put the same upon record for some weeks in order that he might arrange some business that he might not be able to arrange in case the deeds were put on record, as that act might precipitate a crisis in his affairs. The deeds were withheld from record by the executors until a note for $3,500 made by Hurst and endorsed by his father in-law fell due and the executors were informed that it would have to be taken care of. They then, on the 12th day of September, 1902, placed the deeds on record. In a few days afterwards the said Hurst filed his petition in bankruptcy and he was duly adjudged a bankrupt on the 23rd of September. On the 3rd of October, 1902, Gerrard D. Moore, S. W. Washington and David Howell were appointed trustees in bankruptcy of the said Hurst's estate. Under

orders entered in the bankruptcy proceeding Gerrard D. Moore and S. W. Washington, survivors of themselves and David Howell, deceased, trustees in bankruptcy, brought their suit in equity in the circuit court of Jefferson county to set aside as fraudulent and void, as to the creditors of said bankrupt, the said two deeds, making parties thereto Joseph F. Tearney and Edward M. Tearney, surviving executors of Edward Tearney, deceased, and also in their own right, Mary Jane Tearney, J. Garland Hurst and his wife Elizabeth Hurst, heirs at law of said Edward Tearney, said George L. Tearney having died some four months after the death of his father without issue leaving his brothers and sisters his heirs at law. The defendants, except the said Hurst, filed their joint and several answer denying all fraud or knowledge of the fraud of the grantor on the part of the grantee in the execution of said two deeds or in concealing the same and keeping them from recordation; the executors claiming that after the discovery of the deeds after the grantee's death they had withheld them from recordation in compliance with the request as a temporary accommodation to Hurst for a few weeks until he could get his business affairs in some better condition than they were at that time, Hurst stating that his indebtedness amounted to about $10,000 outside of what he owed the estate of Tearney. Plaintiffs replied generally to the answer. The cause was heard and the following final decree entered: "This cause coming on to be heard this 1st day of June, 1905, upon the papers formerly read therein, the exhibits with the bill and answer, the testimony of J. Garland Hurst in the bankruptcy proceedings filed by plaintiff, the depositions of Cleon Moore, George H. Hagley, D. S. Hughes, C. F. Gallagher, Nelson Edwards, H. J. Miller, W. F. Alexander and Edward E. Cooke taken on behalf of the plaintiffs and filed in the Clerk's Office April 1st, 1904, the copy of the report of the Referee in Bankruptcy, filed April 12th, 1904, in the Clerk's Office of this Court, the certified copies of deeds, to Edward Tearney filed by plaintiffs, marked 'Exhibits in Rebuttal,' claim of the estate of Edward Tearney as certified by the Referee, filed in the Clerk's Office April 12th, 1904, and the depositions taken on behalf of the defendant of Dr. Joseph F. Tearney, M. J. Tearney and

Elizabeth T. Hurst returned and filed in the Clerk's Office, December 27th, 1904, and the certificate of John O. Lemen, Clerk of the Referee in Bankruptcy, of a copy of a check of Edward Tearney, dated December 4th, 1896, for $15,000 payable to J. G. Hurst; also the original check of Edward Tearney, dated December 4th, 1896, upon McKim & Co., Bankers, to J. G. Hurst, for $15,000 with the endorsement thereon, 'Pay to J. B. Johnson, Adtr. Signed J. G. Hurst.' And the endorsement thereon of J. B. Johnson, Adtr. which check by the consent of parties was received in evidence without further proof was argued by counsel, upon consideration whereof, the Court is of opinion to and doth deny the relief asked for in the bill and it is thereupon a. o. and d. that this suit be dismissed and that the defendant recover of the plaintiff, their costs in this behalf expended.''

It is contended by the appellants that under the provisions of section 3103, Code 1906, (section 5, chapter 74) the deeds from Hurst to Tearney were void as to all creditors including general creditors, and they cite in support of their proposition *Abney* v. *Lumber Co.*, 45 W. Va. 446, (Syl. Pt. 4), where it is held: "An unrecorded deed is void as to creditors, whether they have notice or not, but it will be good against purchasers with notice, or who have not purchased for valuable consideration." *Guerrant* v. *Anderson* 4 Rand. 208; *Delaplain* v. *Wilkinson*, 17 W. Va. 242, 273. It has always been held in this state that the creditors mentioned in said section 3103 only included such creditors as had a lien or hold upon the land so conveyed and not general creditors. They further say that for the protection of general creditors by statute, section 4005, Code 1906, (section 2, chapter 133) expressly extended the benefit of said statute to general creditors where the provision is made that a creditor before obtaining a judgment or decree for the claim may institute any suit to avoid such conveyance of the estate of his debtor which he might institute after obtaining such judgment or decree. This statute is conclusive in itself, that general creditors were not intended to be protected by said section 3103. It will be observed that the case of *Abney* v. *Lumber Co.*, cited by appellants, was an action brought and an attachment sued out therein and levied upon the property of a foreign insolvent corporation which had made a deed

of assignment of its real estate and personal property for the benefit of all its creditors which deed was held to be unrecordable for want of proper acknowledgment. The plaintiffs by virtue of their attachment had a lien upon said property and such deed not being recorded was void as to the plaintiffs. So in case of *Guerrant* v. *Anderson*, cited, the property was sold by the sheriff under an execution which was a lien prior to that of the unrecorded mortgage. Said section 4005 is construed in *Guggenheimer* v. *Lockridge*, 39 W. Va. 457, where it is held that a creditor, under said section, before obtaining judgment may sue in equity to avoid a fraudulent transfer of his debtor's property and if successful has a lien from the commencement of his suit, clearly implying that he had no right against said property prior to the institution of his suit.

There is no question that Hurst was fraudulently attempting to place his property beyond the reach of his creditors and that Tearney had a knowledge of his indebtedness to insolvency. While it is claimed that he knew nothing of the indebtedness of Hurst, beyond what he owed Tearney himself, he was aware of his indebtedness as sheriff to the State of West Virginia and the county of Jefferson. Tearney knew that Hurst had been elected as a member of the House of Delegates and that he could not take his seat in that body while he was a defaulter to the state as sheriff for public revenues and Hurst applied to him in relieving himself of such default that he might be untrammeled when he should present himself for qualification as a member of the legislature. To have placed the deeds on record at that time would have precipitated a crisis in Hurst's financial affairs at once as it did when they were recorded on the 12th day of September, 1902; his credit would have been at once destroyed and no one could have known this fact better than Tearney himself. By concealing the transaction Hurst's credit would not be impaired and he was enabled to continue business holding himself out to the community as the owner of these two properties, when in truth and in fact he had divested himself of the great bulk of his property and was presenting to the public a false basis of credit and obtained large credits which he could not have enjoyed but for the

conduct of Tearney in concealing the transaction between
Hurst and himself.    Hurst also testified that some of the
money he borrowed from Tearney was to pay money he
owed the Porter estate.    It is not at all probable that Tear-
ney would continue to loan Hurst money without knowing
how it was to be used and the necessity for its use.    On
April 1, 1897, Tearney signed note for $2,000 with Hurst
payable to W. S. Mason and was also Hurst's endorser on a
$3,500 note to the National Bank of Jefferson.    So that
Tearney knew that Hurst was indebted to others besides
himself.    His daughter, who was his nurse and constant
companion, thinks her father did not know anything of
Hurst's outside indebtedness and gives as her only reason
therefor if he had known it "he would have spoken to me
if he had known it; he discussed everything of that kind with
me."  Hurst does not say he told Tearney he owed nobody but
him.    When Hurst received the $15,000 from Tearney it
was to pay off the debt that he owed to the state for taxes
due from him as late sheriff of said county and for which
taxes Tearney was liable on the official bond of said Hurst.
The record shows that in addition to this indebtedness Hurst
owed Tearney some $16,000.    Tearney accepted the deeds
for the two properties and instead of recording them placed
them in his safe and kept them without even the knowledge
of his own children, except Mrs. Hurst and her sister.    The
executors, his sons, claimed to have known nothing of them
until they found them among his papers after his death.
Hurst remained in the possession of the properties, managing
and controlling the same as he had ever done, taking to him-
self the products and profits in no wise accounting therefor
to Tearney who made no pretense or claim thereto, did not
have the properties charged on the assessor's books in his
name and permitted Hurst to keep them on the tax books in
his name paying the taxes thereon, keeping the buildings in-
sured in his own name and for his own use and to all ap-
pearances Hurst was as completely and fully the owner of
said properties as he had ever been.    It does not appear
from the record that Tearney ever made any claim to said
land or did anything that would indicate that he had any in-
terest therein; nor does it appear that he ever mentioned the
transaction to any one—not even to his sons who only discov-

ered the deeds after his death.  It is true that there is some
little evidence that he received some products from the farm
at different times but there was no showing of rents being
paid even in that way, no account of it kept or credits
given.  After the discovery of the deeds by the executors
they called the attention of Hurst to the fact of their exist-
ence, when he requested that they be withheld from recorda-
tion for some weeks and in pursuance of that request and, as
the executors say, for the accommodation of Hurst, they
withhold them from record for several months, their explana-
tion being that Hurst was fearful that placing the deeds upon
record would precipitate a crisis in his affairs; and the sequal
shows that he was correct in his fears, for within some eight
days  after  the  deeds  were  placed  on  record  Hurst
filed his petetion in bankruptcy.  During all the time from
the execution of said deeds, December 4, 1896, to the 12th
of September, 1902, when the deeds were put on record,
there was no visible change in the possession or managament
of said properties, said Hurst remaining in actual, visible
and notorious possession of the property conveyed and noth-
ing on the record to show any change of ownership; and
with every appearance of still being the owner of all such
property he had in that time contracted debts amounting to
quite $50,000.  Tearney had lived more than five years
with these deeds in his possession and, although he had
made a will by which he disposed by items of his large
estate consisting of realty and personalty, he died intestate as
to these two properties, another fact tending to prove that
Tearney regarded the property as still belonging to Hurst.
The will of Edward Tearney was executed on the 16th of
January, 1892, which disposed of all the property he then
owned.  Nearly five years afterwards these deeds were made
by Hurst and his wife and more than five years elapsed after
the execution and delivery of these deeds before the death
of Tearney occurred, and yet no provision was made by cod-
icil or otherwise to dispose of the property conveyed to him
by said deeds.  There is a presumption against partial in-
testacy.  "It will be presumed that a person when he
makes and publishes a will intends to dispose of his whole
estate, unless the presumption is rebutted by its provisions
or evidence to the contrary."  Page on Wills, section 466,

and authorities cited.  If Tearney regarded these properties as his own, why did he not dispose of them with the rest of his property?  His will was in his possession more than five years after the deeds were made to him and it was but five minutes work to have added a codicil disposing of this property.  It is contended by appellees that it was his purpose and intention to devise the same to Mrs. Hurst but he did not do it.  May it not well be inferred that he did not regard the property as belonging to him and that he was holding it for the grantor?  The evidence of the fraudulency of these deeds is necessarily circumstantial—no sufficient explanations are made in relation to the transaction.  As said by appellants in their brief: "Intention cannot be seen or heard. It is generally not susceptible of direct proof.  It has therefore become a maxim which applies to this sort of case as to any other, 'A man is presumed to intend the natural and probable consequences of his action.'  By the application of this maxim fraud is frequently discovered."  Indeed, in most cases it has to be discovered through the circumstances which environ the transaction, as the parties intending to commit fraud throw all the obstacles possible in the way of discovery.

Appellees to sustain their decree rely upon the rule that, the burden of proof is on the one alleging fraud "and if the fraud is not strictly and clearly proved, as it is alleged, relief cannot be granted."  Citing *Trustees* v. *Blair*, 45 W. Va. 812; *Armstrong* v. *Bailey*, 43 W. Va. 778, and many other authorities.  Which as a proposition will hardly be disputed that "fraud must be proved and is never presumed;" but it does not necessarily follow that fraud must be proved always by direct evidence.

If the rule could be so applied, it would generally be impossible to prove it, as fraudulent intent is usually locked within the breast of him who committed it; but fraud may be presumed from circumstances which have been proved and may he said to be generally proved by circumstantial evidence.  In *Kaine* v. *Weigley*, 22 Pa. St. 179, it is held: "The proposition that 'fraud must be proved and not presumed,' is to be understood only as affirming that a contract honest and lawful on its face, must be treated as such until it is shown to be otherwise by evidence either positive or

circumstantial. Fraud may be inferred from facts calculated to establish it." Chief Justice Black, in rendering the opinion in that case, has discussed this matter so thoroughly and well at page 183 that I quote therefrom as follows: "It is said that fraud must be proved, and is never to be presumed. This proposition can be admitted only in a qualified and very limited sense. But it is often urged at the bar, and sometimes assented to by judges, as if it were a fundamental maxim of the law, universally true, incapable of modification, and open to no exception: whereas it has scarcely extent enough to give it the dignity of a general rule; and, as far as it does go, it is based on a principle which has no more application to frauds than to any other subject of judicial inquiry. It amounts to this: that a contract, honest and lawful on its face, must be treated as such until it is shown to be otherwise by evidence of some kind, either positive or circumstantial. It is true that fraud can *never* be presumed. Presumptions are of two kinds, *legal* and *natural.* Allegations of fraud are sometimes supported by one and sometimes by the other; and are seldom, almost never, sustained by that direct and plenary proof which excludes all presumption. * * * * * * * When creditors are about to be cheated, it is very uncommon for the perpetrators to proclaim their purpose, and call in witnesses to see it done. A resort to presumptive evidence, therefore, becomes absolutely necessary to protect the rights of honest men from this, as from other invasions. Upon such evidence the highest criminal punishments are inflicted, and the most important rights of property constantly determined. Fraud in the transfer of goods or lands may be shown by the same amount of proof which would establish any other fact; in its own nature as likely to exist. In any case, the number and cogency of the circumstances, from which guilt is to be inferred, are proportioned to the original improbability of the offence. The frequency of fraud upon creditors, the supposed difficulty of detection, the powerful motives which tempt an insolvent man to commit it, and the plausible casuistry with which it is sometimes reconciled to the consciences even of persons whose previous lives have been without reproach; these are the considerations which prevent us from classing it among the grossly im-

probable violations of moral duty; and therefore we often
presume it from facts which may seem slight.   Besides, when
a man, who knows himself unable to pay his debts, disposes
of his property for a just purpose, he can easily make and
produce the clearest evidence of its fairness.   *   *   *   *
It is no hardship upon an honest man to require a reasonable
explanation of every suspicious circumstance, and rogues
are not entitled to a veto upon the means employed for their
detection." This quotation was approved by JUDGE GREEN
in his opinion in the case of *Burt* v. *Timmons*, 29 W. Va.
441.   In the last mentioned case, at page 460, JUDGE GREEN
says:   "I suppose, that the real trouble in reaching correct
decisions in these cases is, that the rules of law, which
have been laid down, have been misapprehended, though
this Court has endeavored to make them clear.   Yet some
seem still to think and act as though, to establish a fraud in
cases like the one before us, required evidence almost as
strong as the evidence required to convict in a criminal
prosecution; and when fraud is established by direct proof
or by necessary inference, they seem to think, that the
slightest evidence ought to be regarded as sufficient to ex-
plain and rebut the facts, which establish the fraud.   It is
hoped, that these erroneous views will be abandoned; for, if
they prevail, our married woman's act and acts permitting
interested witnesses and parties to testify and husbands and
wives to testify for each other will be utterly perverted from
the purpose for which these acts were passed; and they
will become the fruitful source of fraud and perjury.   These
acts were not designed, and the courts should not permit
dishonest debtors to use them, to defraud their honest credi-
tors and retain their property for their own use by with-
drawing it from their creditors by fraudulent investments
of it in the names of their wives.   This practice is becoming
too common and should be strongly discountenanced by the
courts.   It can not be effectually checked, so long as the
false views of the evidence necessary to establish fraud in
such cases and to rebut it, when *prima facie* established,
are abandoned." This utterance of JUDGE GREEN is also
quoted with approval in *Stauffer* v. *Kennedy*, 47 W. Va. 714-
723.   See also *Vandervort* v. *Fouse*, 52 *Id.* 214, 218;
*Knight* v. *Neace*, 53 *Id.* 50; *Ballard* v. *Chewning*, 49 *Id.*

508; *Hutchinson* v. *Boltz*, 35 *Id.* 755; and *Reynolds* v. *Gawthrop*, 37 *Id.* 3.

The relations existing between Hurst and Tearney were of the closest and most cordial character both socially and from a business standpoint. Tearney was a man of considerable wealth and large estate, was the father of the wife of Hurst; while Hurst was a business man and had been in prosperous circumstances but at the time of the transaction complained of he had become largely indebted, even to insolvency, he had been elected to an honorable position and his father-in-law would naturally be inclined to assist him in placing himself in a position to take his seat in the body to which he had been elected and it was necessary for him to make known to his father-in-law the straitened circumstances to which he found himself and the necessity for removing his disability to take the office. This brought to the attention of Tearney in a very emphatic way the manner in which Hurst had conducted his office of sheriff and he must necessarily have known his financial condition. In his anxiety to assist his son-in-law it was an easy matter and a most natural thing for him to agree to withhold from recordation the deeds which he must have known would destroy the credit of Hurst the moment they were put upon record. It has been held in many cases that, transactions between near relatives will be more strictly scrutinized and be regarded with greater suspicion of fraud and unfairness than transactions of the same kind between strangers. As said in *Knight* v. *Capito*, 23 W. Va. 639: "The son will be held to stricter proof of his honesty in dealing with his father than a stranger would be." And in *Livey* v. *Winton*, 30 W. Va. 554, (Syl. Pt. 5,) it is held: "Transactions between father and child, husband and wife, brother and sister, between whom there exists a strong natural motive to provide for each other, at the expense of creditors, when sought to be impeached as fraudulent, require less proof to show fraud, and, on the other hand, when a *prima facie* case is made, much stronger proof to show fair dealing than would be required if the transaction were between strangers." In *Moore* v. *Gainer*, 53 W. Va. 403, (Syl. Pt. 1:) "When a conveyance in favor of a relative leaves a man without means to satisfy his creditors, it is the basis of a strong suspicion of

fraud; it is *prima facie* fraudulent, and calls upon the grantee to furnish strong proof of the *bona fides* of the transaction." *Riley* v. *Barr*, 34 *Id.* 95; *Burt* v. *Timmons*, *supra.* "Sales and conveyances to near relatives and members of his household made by a debtor are looked on with suspicion and closely scrutinized, and if voluntary, are *prima facie* fraudulent as to existing creditors. The relationship of the parties is to be taken into consideration in connection with all the other circumstances of the transaction alleged to be fraudulent."—5 Cur. Law, 1565, and authorities there cited. See also 20 Cyc. 601, 607, and authorities cited.

It is in evidence that in the summer of 1902, Hurst applied for a loan of $6,000 or $7,000 proposing to secure the same by giving a first lien on the properties conveyed to Tearney thereby representing the same to be still owned by him. In 14 A. & E. E. L., 497, it is said: "The declaration of the vendor made after the sale may be given in evidence if the vendor continues to hold possession of the goods inconsistently with the deed, or if the delivery be doubtful; but it is otherwise if the retention of possession be consistent with the terms of the deed or contract." *Colston* v. *Miller*, 55 W. Va. 490, 494.. Wait on Fraudulent Conveyances, section 279: "As proof of the continued possession of the vendor is competent evidence to impeach the supposed transfer, it would seem to follow that any acts or declarations of the possessor while so retaining the property must also be competent as characterizing his possession." During all the time from December 4, 1896, until September 12, 1902, Hurst, the grantor, had the exclusive possession, control and management of the said properties so conveyed and Tearney, by his conduct in permitting him to so use it and treat it as his own, must be held to have ratified said statements and acts of Hurst as being the real owner of the properties. *Timms* v. *Timms*, 54 W. Va. 414, 419.

2 Pom. Eq. Jur., section 803, announces this general principle: "When one of two innocent persons—that is, persons each guiltless of an intentional moral wrong—must suffer a loss, it must be borne by that one of them who by his conduct—acts or omissions—has rendered the injury possible." In *Roberts* v. *Tavener*, 48 W. Va. 632, this principle is car-

ried into the syllabus, point 1.   We find the same principle held in *Slater* v. *Moore*, 86 Va. 26: "If grantee or third party must suffer from the grantor's fraud, the grantee, who put it in the grantor's power to commit the fraud, must bear the consequences."   In *Neslin* v. *Wells*, 104 U. S. 428, 439, this principle is stated in very terse and comprehensive form quoted from Lord Romilly, Master of the Rolls, in *Briggs* v. *Jones*, Law Rep. 10 Eq. 92, 98: "A person who puts it in the power of another to deceive and raise money must take the consequences.   He cannot afterwards rely on a particular or a different equity."   And why should this not be so?   As it is well said in *Delaplain* v. *Wilkinson*, *supra*, at page 273: "When the vendee has a deed or other written evidence of his purchase, there is no hardship in requiring him to place it upon the record; and it may be said that it is gross *laches* not to do so."

For the reasons herein stated, the decree of the circuit court of Jefferson county must be reversed and the cause remanded with instructions to decree the sale of the property for the benefit of the plaintiffs as trustees in bankruptcy of the said defendant Hurst.

*Reversed.   Remanded.*