In re MILEY.

(District Court, N. D. West Virginia. April 25, 1911.)

1. VENDOR AND PURCHASER (§ 46*)—CONTRACT—CONSTRUCTION.
Where a contract for the sale of real estate was written by the vendor who was a lawyer, it would be construed most strongly against him.
[Ed. Note.—For other cases, see Vendor and Purchaser, Dec. Dig. § 46.*]

2. PRINCIPAL AND AGENT (§ 103*)—SCOPE OF AUTHORITY—KNOWLEDGE.
Where a vendor, in selling certain real estate, dealt with the vendee as agent for another, it was incumbent on him to inform himself as to the extent of the vendee's authority, for he could not assume, because he

knew the agent was authorized by his principal to purchase cattle, sheep, and hogs, that he was authorized to purchase hotel properties for him.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 278–293; Dec. Dig. § 103.*]

3. PRINCIPAL AND AGENT (§ 141*)—WRITTEN CONTRACT—PERSONAL LIABILITY OF "AGENT."

The word "agent," written after the name of the vendee in a written contract for the sale of real estate without further disclosure of the person for whom he was agent, would be rejected as surplusage or treated as descriptio personæ, and not a word of limitation.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 497; Dec. Dig. § 141.*

For other definitions, see Words and Phrases, vol. 1, pp. 262–270; vol. 8, p. 7569.]

4. VENDOR AND PURCHASER (§ 33*)—CONTRACT—CANCELLATION—FALSE REPRESENTATIONS.

Claimant being approached by the bankrupt, who was agent for G. to purchase stock, with reference to the purchase of certain hotel properties, a contract was agreed on, and claimant, being a lawyer, drew the contract, in which the bankrupt was named as the vendee with nothing to show that he was acting for G., except that the word "agent" was written after his name. The bankrupt was given possession of the property and allowed to make improvements, and required to board the claimant and his wife. Thereafter G. repudiated the contract, but claimant accepted a draft on G. for $3,000 for the first payment under the agreement; G. charging the amount to the bankrupt's account as an advancement. Claimant took no steps to ascertain from G. whether the bankrupt was authorized to purchase the property for him at the time of the sale, though he could have done so by wire in a few hours. *Held,* that claimant was not entitled to repudiate the contract because of alleged false representations that the bankrupt was acting as agent for G., and not for himself.

[Ed. Note.—For other cases, see Vendor and Purchaser, Dec. Dig. § 33.*]

In the matter of the bankruptcy proceedings of John R. Miley. On petition to revise an order of the referee directing a sale of certain real estate by the trustee against the objections of the vendor. Affirmed.

W. C. Kilmer and Dailey, Gamble & McCauley, for petitioner.
W. H. Griffith and H. H. Emmert, for trustee.

DAYTON, District Judge. I have very carefully considered the matters involved in this controversy which have been exhaustively and ably argued by counsel. The referee has filed an elaborate opinion in support of the ruling made by him, in which the facts are set forth. As I purpose to file this opinion as part hereof, I will not restate the facts. I am convinced that I must sustain the conclusions arrived at by the referee, for these reasons:

[1, 2] First. The contract, having been written by Carr, must be construed the stronger against him. If he was dealing with Miley as agent of Gebhart, it was incumbent on him to inform himself as to the extent of such agency in advance of contracting. He was not authorized in my judgment, because he knew Miley was Gebhart's authorized agent to purchase cattle, sheep, and hogs, to assume that he was his agent to purchase hotel properties.

[3] The word "agent," following Miley's name in this contract under seal, without further disclosure of for whom he was agent, might well be held either surplusage or a word of description, and not limitation. If this had been a deed rcorded, this word would not have prevented a creditor of Miley from obtaining a judgment lien against the property, good against any claim of title by Gebhart as principal. The cases in West Virginia go very far to hold that in such contracts the agent alone is personally bound. See Rosendorf v. Poling, 48 W. Va. 621, 37 S. E. 555; Dyer v. Duffey, 39 W. Va. 149, 19 S. E. 540, 24 L. R. A. 339; Curry v. Hale, 15 W. Va. 867; Devendorf v. W. Va. Oil Co., 17 W. Va. 135, 149, 150; Hurst v. Hurst, 7 W. Va. 289; Scraggs v. Hill, 37 W. Va. 706, 17 S. E. 185; Knowlton v. Campbell, 48 W. Va. 294, 37 S. E. 581; Martin v. R. R. Co., 48 W. Va. 542, 37 S. E. 563.

[4] As to the contention that Carr was misled by false representations on the part of Miley as to his acting solely as Gebhart's agent in the purchase, I am compelled to hold such contention untenable because (a) he drew the contract, as I have above pointed out, so as by law to bind Miley personally and alone, not Gebhart; (b) he gave possession of the property to Miley; (c) by other terms of the contract provided that Miley should board himself and wife; (d) allowed Miley personally to make improvements on the property; (e) accepted, after Gebhart had personally repudiated the contract, payment of the same $3,000 draft drawn by Miley on Gebhart instead of returning it and promptly, if the exigencies required, resorting to legal proceedings to set aside and annul the contract and reclaim the property.

That Gebhart, after full knowledge of the facts and after he had repudiated the contract, paid this draft and charged it on his books to Miley, very clearly establishes him a creditor of Miley as to this $3,000, nothing more and nothing less. He and Carr could not enter into a legal contract whereby, in effect, Gebhart could pay $3,000 to Carr on Miley's purchase price, charge it to and recover it back from Miley, at the same time repudiate Miley's contract, whereby Carr would still have the property with all of Miley's improvements thereon, and, when Carr sold it to some one else, get back the $3,000 a second time as well as one-fourth of the surplus over and above Miley's contract price of $12,000 that Carr might realize from such sale. If Carr had been misled by Miley's representations as to his agency, when Gebhart came forward and repudiated the contract, the right and proper thing to have done would have been to call in Miley, restore to him the protested draft for $3,000, cancel the contract with him, and secure repossession of the property.

Other reasons for the conclusions reached are set forth in the referee's opinion attached hereto.

Let order be entered affirming in all respects the decree entered by the referee.

NOTE.—The opinion of James D. Butt, referee, is as follows:

Briefly stated, the facts in this case are as follows: On the 20th day of April, 1910, H. S. Carr and wife entered into a written agreement, under seal, with John R. Miley, agent, agreeing to sell to the said Miley agent the Mul-

len Hotel property and some extra lots therein set forth, located at Moore-field, W. Va., for the sum of $12,000. The terms of payment are fully set forth in the written agreement which is filed as an exhibit with the petition of the trustee, and admitted by the said Carr in his petition or answer in the case. On the 1st or 2d day of May, 1910, said J. R. Miley, agent, was placed in possession, custody, and control of all of the property named in the agreement of April 20, 1910, and so remained until August 25, 1910, when he turned the same over to Jno. O. Lemen, receiver in bankruptcy; said Jno. R. Miley having been adjudicated a bankrupt on the 24th day of August, 1910. The receiver held the property till on the 16th day of September, 1910, when he was elected by the creditors, trustee of the said estate, and then as receiver turned the same over to the trustee in bankruptcy, and as such has since held it in his possession, custody, and control. Between the 1st day of May, 1910, and August 25, 1910, it is not denied that, whilst Jno. R. Miley, agent, was in possession, custody, and control of the property mentioned in the agreement, he placed thereon permanent and valuable improvements to the value of from $300 to $500, and that such was its condition when it came into the hands of the trustee in bankruptcy.

On the 3d day of October, 1910, after proper and admitted notices to all of the creditors, including H. S. Carr, the vendor under the agreement of April 20, 1910, the said trustee filed a petition with the referee praying an order directing him to sell at public auction the said "Mullen Hotel property" and all the other real estate mentioned in the agreement of April 20, 1910, for the benefit of the estate of John R. Miley, bankrupt. Whereupon, the said H. S. Carr filed a petition with the referee, setting out facts from which he claimed "that the agreement of April 20, 1910, had been procured by misrepresentation and fraud on the part of said Jno. R. Miley, agent," and prayed that the petition of the said trustee be dismissed. Upon these two petitions, together with the testimony presented and oral argument of counsel and briefs submitted, the referee heard and considered the case, and on the 19th day of October, 1910, entered an order sustaining the petition of the trustee and directing him to make sale of the property as set out in his petition, all of which appears at full length in the order and certificate for review. The jurisdiction of the referee to hear and determine all the questions raised by the petitioners was not denied, and therefore all parties are in a court of equity, and, in accordance with the procedure of such courts, will be granted or denied relief. In re Rochford, 124 Fed. 182, 59 C. C. A. 388; A., T. & S. R. R. Co. v. Hurley, 153 Fed. 503, 82 C. C. A. 453, affirmed in 213 U. S. 126, 29 Sup. Ct. 466, 53 L. Ed. 729; In re Elletson Co. (D. C.) 174 Fed. 859; Coal Land Case v. Ruffner Bros., 21 Am. Bankr. Rep. 474, 165 Fed. 881, 91 C. C. A. 559 (4th Circuit).

Where an executory contract of a bankrupt comes to his trustee, it is for the latter to determine what, if any, action he will take thereunder. If he is of opinion to enforce it will be of benefit to the creditors, he may take such action as he thinks the situation warrants. He may enforce it specifically, or he may invoke the aid of the court in subjecting the interest of the bankrupt therein and "reduce the same to money." Mound Mines Co. v. Hawthorne, 173 Fed. 882, 97 C. C. A. 394. (In this case specific performance was decreed in favor of the trustee.) "Trustees in bankruptcy can assume an executory contract of the bankrupt and dispose of it for the benefit of the estate, and take such action under it as they may deem for the best interest of the estate." A., T. & S. F. R. Co. v. Hurley, 153 Fed. 503, 82 C. C. A. 453, affirmed 213 U. S. 126, 29 Sup. Ct. 466, 53 L. Ed. 729. In this case the trustee in his petition avers that it is for the best interest of the creditors to have the property in question sold and the proceeds applied for the benefit of the creditors. Mr. Carr in his petition does not deny the execution of the agreement to sell the Mullen Hotel property to Jno. R. Miley, agent, which is dated April 20, 1910, and that he placed said Miley in possession thereunder, and that said Miley was in possession of it when he was adjudicated a bankrupt, and that Miley had placed thereon valuable and permanent improvements, but rather seeks to avoid the agreement solely upon the grounds that it was procured from him by misrepresentation and fraud practiced by said Miley. He does not ask a performance of the agreement by the

trustee. Therefore the petition of Mr. Carr must be treated as one solely for a "rescission and cancellation by reason of fraud" of the agreement of April 20, 1910. "The avoidance of transactions on the ground of fraud is a copious source of jurisdiction in equity." Adams, Equity, p. 175. In speaking of contracts obtained by misrepresentation and fraud, Fry on Specific Performance, at page 315, says: "They are not void, but voidable only. They are not a nullity." So, to entitle the complainant to relief under the averments of his petition, it must conform to the usual established rules of equity which prevail in such cases; and he must prove his averments by testimony so clear and explicit as to leave no doubt in the mind of the court. If in his petition he fails to aver a state of facts from which the court can see that he is entitled to relief, the court on its own motion will deny it. Fougeres v. Jones (C. C.) 66 Fed. 316. "A bill for rescission must contain clear and positive allegations showing the equitable right of the complainant to the relief asked." Post v. Beacon Pump Co., 84 Fed. 371, 28 C. C. A. 431.

At this point it may be well to advert to the fact that the petition in this case of Mr. Carr prays for no specific relief; and query, whether under a prayer for general relief the complainant in this case could obtain any relief other than for the amount of his debt as set forth in his petition. It is conceded that in many jurisdictions courts of equity are very liberal in granting relief under a prayer for "general relief," but the equity procedure of federal courts is very largely controlled by fixed rules, and rule 21 of equity rules says: "That the prayer of the bill shall ask the special relief to which the plaintiff supposes himself entitled, and shall also contain a prayer for general relief." Under the averments of this petition, a mere dismissal of the petition of the trustee would not be "consistent with the case if made out" (for it would place the subject-matter of the controversy in no one). Walden v. Badly, 14 Pet. 156, 10 L. Ed. 393; Hobson v. McArthur, 16 Pet. 182, 10 L. Ed. 930. From the foregoing it seems the petitioner in this case might well be denied any relief except for the amount of his debt, if proven. "A court of equity is always reluctant to rescind, and will give relief only when the clearest and strongest equity imperatively demands it." Grymes v. Sanders, 93 U. S. 55, 23 L. Ed. 798. "The rules of law relating to specific performance, and those applied to the rescission of contracts, although not identically the same, have a near affinity to each other." Boyce's Ex'r v. Grundy, 3 Pet. 210, 7 L. Ed. 655, and it may therefore be deemed advisable to discuss some of the rules of equity applicable to specific performance. "Where a bill seeks relief on the ground of fraud, it should point out and state particular acts of fraud in a clear and precise manner and with an averment of their injurious result." Fletcher's Equity Pleading and Practice, p. 131. "When there is an inconsistency between an averment in a bill and a written instrument attached thereto as an exhibit, the latter must prevail." Lockhead v. Berkeley Springs Waterworks Co., 40 W. Va. 553, 21 S. E. 1031. "Repugnancy between the averments of a bill and exhibit attached thereto renders the bill subject to demurrer." Little v. Snedocar, 52 Ala. 167.

The petition of Carr avers that he made the agreement of April 20, 1910, with John R. Miley, agent for W. A. Gebhart, when, in fact, the agreement states that it was made with John R. Miley, agent. If the exhibit with its recitals is to prevail, then the statement of misrepresentation relative to Miley being the agent of W. A. Gebhart are not averments of fraud, hence the petitioner has not complied with the rules of equity pleading which requires him to state in his petition "facts in a clear and precise manner which would entitle him to relief." It is admitted that H. S. Carr, the party of the first part, under the agreement of April 20, 1910, drew up the same, and, being lawyer of ability and great experience, it must be presumed that he wrote into that agreement all that the parties thereto intended, and it would therefore seem that, when he failed to insert in the agreement the name of W. A. Gebhart as principal, the contracting parties did not so intend. "Any declarations made at the time, relative to the property, if not incorporated in the written contract, are presumed to have been abandoned by the parties as forming no part of it." Turner v. Navigation Co., 17 N. C. 236. The agreement between the parties in this case was reduced to writing many days after it was made, and the courts have held "that reducing an agreement to

writing is in most cases an argument against fraud." Boyce's Ex'r v. Grundy, 3 Pet. 210, 7 L. Ed. 655. If the law as here stated is a correct exposition of the rules which should govern, then it is difficult to see wherein this petitioner by the averments in his petition has stated a case of fraud wherein a court of equity should grant him relief. In the leading case of Southern Development Co. v. Silva, 125 U. S. 250, 8 Sup. Ct. 881, 31 L. Ed. 678, it is held, "that, in order to justify a court of equity in setting aside a contract on the ground of fraudulent misrepresentation, the complainant must show by clear and decisive proof that the defendant has made a representation in regard to a material fact, and that it was acted on by the complainant to his damage and injury." On this subject for a full and elaborate discussion, see Crislip v. Cain, 19 W. Va. 438; Wamsley v. Currence, 25 W. Va. 543. "The party must have been misled to his injury by the representations." Wilson v. Carpenter, 91 Va. 183, 21 S. E. 243, 50 Am. St. Rep. 824; Love v. Teter, 24 W. Va. 741. Pomeroy's Equity, § 898, says: "The party must have suffered some pecuniary loss or injury as the natural consequence of his conduct induced by the misrepresentations. Fraud without resulting pecuniary damage is not a ground for the exercise of remedial jurisdiction." Kiefer v. Rogers, 19 Minn. 32 (Gil. 14), says "that false representations which cause no injury is no ground for relief. The injury must be a pecuniary character." This seems to be the law of both federal and state jurisdiction. "A party seeking a rescission of a contract must show that he has been misled in regard to a material matter by representation and conduct of the other party to his injury"; but courts will not rescind a contract when the party seeking it has not been prevented from obtaining and receiving all the benefit contemplated by it and to which he is entitled under it. Seelley v. Reed (C. C.) 25 Fed. 361. "When no damage, present or prospective, can result from a fraud or false representation, or misrepresentation made, a court of equity will not entertain a petition for relief." Dunn v. Remington, 9 Neb. 82, 2 N. W. 230. The petition in this case utterly fails to state any facts from which an inference might even be drawn that he had suffered or was likely to suffer any sort, character, or description of injury or damage by reason of the alleged representation or misrepresentation of John R. Miley in relation to the contract between them of April 20, 1910. In the case of Atlantic Delaine Co. v. Jones, 94 U. S. 207, 24 L. Ed. 112, the court said: "The power of a court of equity to cancel a contract ought not to be exercised unless the fraud and false representation set up as a ground for relief are clearly proved, and the complainant has been thereby deceived and injured." If facts constituting pecuniary injury are not clearly set out in the petition, no proof of the same could be offered; hence no relief in accordance with the rule laid down in the above case. Again, in cases where the deceived party desires to rescind a contract for fraud, immediately upon the discovery of the fraud, he must notify the other party of his intention to disaffirm the contract. Pomeroy, Equity Jurisprudence, § 897. "He must do so promptly." Greenwood v. Fenn, 136 Ill. 146, 26 N. E. 487. "When a party desires to rescind upon ground of fraud, he must do so at once. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which before subsisted." Grymes v. Sanders, 93 U. S. 55, 23 L. Ed. 798. From Boyce's Ex'r v. Grundy, 3 Pet. 210, 7 L. Ed. 655, it appears that the bill must aver that the deceived party gave notice to the other party "that he would resume possession of the premises and receive the rents and profits, for that he would not comply with the contract." There is nothing averred in the present petition showing that Mr. Carr ever gave Mr. Miley any such notice. The petition does not aver that Mr. Carr wholly relied upon the statements made by Miley that he was the agent for Gebhart and that thereby he was induced to make the contract. He did not seem to consider them material, for all he did was to make inquiry of the bank as to Gebhart's financial standing. This is all he avers in his petition. He could have easily wired Gebhart, and in a few hours found out the truth. If he had the full means of investigating the truth or falsity of the representation and did not avail himself of them, he is presumed to have acted on his own judgment, and in equity is estopped from complaining. "If a party chooses to judge for himself and does not avail himself of all the knowledge and means of knowledge open to him, he will not afterward

be allowed to say that he was deceived by the representation." Fry on Specific Performance, p. 293. "These principles are applicable, not only where the deceived party resists specific performance, but where he assumes the position of complainant and seeks to set aside the contract on the ground of misrepresentation." Id. p. 297.

It does seem, therefore, that the petitioner under the averments of his petition has not stated a case which entitles him to relief in a court of equity. But, ignoring what seems to be the fatal defect of the petition, would the conduct of the parties and the testimony show that Mr. Carr would be entitled to the relief he asked? Mr. Carr has been a practicing lawyer since 1866, is a man of great experience as a business man, and he was the vendor. He drew up the agreement, and it must be presumed that he wrote into it everything that he considered material and for his own benefit, but it is found from an inspection of the agreement of April 20, 1910, that he omitted to mention the name of W. A. Gebhart; furthermore, when the draft for the $3,000, being the first payment under the agreement, was given to him by John R. Miley, agent, he accepted the same, and nowhere in his testimony does he state that this was a mistake or oversight on his part, and from this it is but fair to presume that he did not consider what Mr. Miley said relative to W. A. Gebhart as being at all material, and this presumption is perfectly reasonable when it is recalled what Mr. Carr, in his testimony, says on that point. In substance he says: That, when Miley came to him to make the deal, he (Carr) wanted to make inquiry for whom the purchase was being made; but that he (Miley) was very indefinite, and did not seem inclined to say who it was for. "Carr named several parties, and Miley said it was for some one living out of the state—said he was acting for W. A. Gebhart. I don't know how he expressed it exactly. I asked him whether he was authorized by W. A. Gebhart to purchase the property. He told me that he would talk the matter over with Mr. Gebhart—would purchase if he could get it at a fair price, words to that effect." This conversation took place several days before the agreement was drawn up and signed. From this it will be seen that Miley was evasive and noncommittal to such an extent as to put Carr on his guard and inquiry if he considered Gebhart's connection with the matter as material and as an inducement for his action. He knew that for years Gebhart had been giving Miley financial aid in his business affairs in Hardy county, and all he seemed to care about was Gebhart's financial standing, and for that purpose alone he made inquiry of the bank at Moorefield. This language of Mr. Miley to Mr. Carr is not what the courts define to be a "misrepresentation of the material fact," as an inducement for one to act upon, but rather as an opinion or "deal talk." "Mere dealing talk" does not amount to misrepresentation. Reynolds v. Palmer (C. C.) 21 Fed. 433. "Equity will not relieve against misrepresentation which is a matter of opinion and open to the inquiry and examination of both parties." Buckner v. Street (C. C.) 15 Fed. 365.

So from Mr. Carr's testimony on that point it does not appear that Miley ever made statements that would convince him or any intelligent man that he (Miley) was acting as the agent for W. A. Gebhart in procuring the agreement of April 20, 1910; and take the testimony of Mr. Carr in its entirety and it absolutely fails to show that he has not received all the benefits under it which he might have received had he made the same with any person. He was paid the first payment of $3,000 and holds a perfectly good lien (if he can establish it) for $9,000, the balance of the purchase price. He fixed his own price on the property at $12,000, and said in his testimony that it was fair, so nothing said by Mr. Miley could have caused him the loss of a dollar. The property in question has been appraised at $14,500, and the testimony tends to show that it will bring more if put up at public sale. That being true, of what can he complain in a court of equity? It is true that the testimony tends to show that at times subsequent to the making of the agreement Miley did say that he thought he was buying the property for Gebhart, but that was only a matter of opinion, and for settlement between Gebhart and himself, and in nowise affected Mr. Carr. The testimony of both Carr and Miley is overflowing with inconsistencies, but it must be remembered that Mr. Carr is deeply interested in the present controversy, and Mr. Miley

is not. Mr. Carr got the $3,000—he is keeping it. Under an agreement made with Gebhart of May 20th (but dated May 7th), he is seeking to oust Miley and his creditors, and get the property and sell it for the benefit of himself and Gebhart, and, if the property should sell for $14,500 as appraised, they would realize $14,500 and any dividend that might be declared on the $3,000 (cash payment) instead of $12,000. The testimony shows that Miley gave a draft on W. A. Gebhart in favor of Carr, dated May 2, 1910, for $3,000, the first payment under the agreement of April 20th. This draft was to be paid on May 9th. It is true that it was protested on the 5th of May for "nonacceptance," Mr. Gebhart being out of the city, but the fact remains that on the 9th of May Gebhart did honor this identical draft and paid in and charged the amount against Miley on his books. A statement from Gebhart to Miley of May 31, 1910, shows this fact, and the testimony also shows that in June, 1910, Miley executed a note to Gebhart for $3,000, thus tending to show and support Miley in his statement that Gebhart had loaned him the $3,000. Mr. Fisher states that Gebhart told him that he had loaned Miley the $3,000. Mr. Fisher is a disinterested witness in this case. In explanation of the payment of the $3,000, Mr. Gebhart in his testimony undertakes to explain it by saying that it was really paid to Carr under the agreement between them dated May 7th (but made May 20th) and was charged up against Carr on his (Gebhart's) ledger, and that his clerk only charged it on the day book to Miley by mistake, and did not carry it on the ledger. Now, the very best proof of that fact is the ledger itself or some memorandum from it. It was in the absolute control of Mr. Gebhart. He must have known of its importance in the present controversy. He came from Baltimore to Moorefield as a volunteer witness, and is interested with Mr. Carr in the result. He failed to produce the book or any statement from it; hence the presumption is very strong that no such entry as he claimed was made in the ledger, and that its production would injure his cause. "Where evidence is opened to interpretation and it is within the exclusive power of one party to show what the truth is, the failure of such party to produce the evidence will authorize the presumption that, if produced, it would be unfavorable to him." Robinson v. Union C. L. I. Co. (C. C.) 144 Fed. 1005. "The nonproduction of evidence that would naturally have been produced by an honest and therefore fearless claimant permits the inference that its tenor is unfavorable to the party's cause." 1 Wigmore on Evidence, p. 368.

Mr. E. E. Bonney, a disinterested witness, testified that Mr. Carr told him that he had sold the Mullen Hotel property to John R. Miley, and did not mention the name of Mr. Gebhart in connection with it. The testimony nowhere shows that Gebhart ever refused to pay the draft which Miley drew on him in favor of Carr to carry out the provisions of the agreement of April 20, 1910, but the testimony does show that on the evening of May 6th, when all parties met in Carr's office in Moorefield, Gebhart did agree to "take care of said draft" for Miley if he (Miley) would furnish him (Gebhart) with a statement of the live stock account between them. The very next day he did furnish that statement drawn up for him by Mr. Carr, and in it Miley recognized that he owed Gebhart the $3,000. Mr. Carr states that he never showed this statement to Mr. Gebhart, and has utterly failed to give satisfactory reasons for so doing. Mr. Gebhart's brother knew that this statement had been furnished by Miley, and that Carr had it, and it is but fair to say that Mr. W. A. Gebhart saw it and knew its contents. So it appears that Mr. Miley did all they asked of him in order "to take care of the $3,000 draft." All the statements of Mr. Carr and Mr. Gebhart that the $3,000 draft was paid by Gebhart to Carr for the purpose of "permitting Miley to remain in the hotel until the statement of the stock account should be furnished by Miley" is so unreasonable and unconscionable as not to merit consideration in a court of equity, especially so when it is recalled that the stock account was furnished by Miley the next day, thus asking the court to believe that $3,000 was paid and accepted that a man might remain for 24 hours in a hotel property, the rental value of which is shown to be $100 per month. These statements, though sworn to, are so absurd and unconscionable that well might the maxim of "falsus in uno, falsus in omnibus," be applied to their entire testimony in this case.

The testimony in this case shows that Miley complied with all the require-ments of the agreement of April 20, 1910, and would have been entitled to his specific performance. Even if Miley had represented to Carr that he was the agent for Gebhart and it had turned out to be a fact that he was not, still he would have been entitled to a specific performance. "It is for obvious reasons necessary to constitute a misrepresentation which will prevent a specific performance, that the statement in question shall be so material to the contract built on it that, if the statement be false, the contract becomes one which it would be unconscionable to enforce by the party making it. Therefore, where A. induced a purchaser to think that he was contracting with B. through his (A.) agency, whereas he was contracting with A. himself, but there was nothing to induce the belief that he would not have contracted on the same terms with A., or that he had sustained any loss from acting under the mistake, the court enforces a performance of the contract." Fry on Specific Performance (1881 Ed.) p. 299. "A misrepresentation may or may not be a fraud." Id. p. 282.

When Carr and Gebhart entered into the agreement of May 20th (dated May 7th) to get this property away from Miley, sell it, and divide the proceeds among themselves, they both knew that Miley was insolvent; that they had on the 1st day of May, 1910, put him in possession of the same under a contract of sale; that the public must have known the facts, and from which and upon the strength of said possession Miley must have been able to get further and enlarged credit; that from their view of the case he was holding the same by fraud, still they permitted him to remain in possession and control of the same without giving the public any notice of what they considered changed relations between the parties, entered into an agreement in which they claimed that they, and not Miley, owned the property, failed to place the agreement on record, and permitted this state of affairs to exist until in August, 1910, but a very short time before Miley was adjudicated a bankrupt. It might well be said that they were guilty of a fraud on the creditors of Miley during that period. This seems to be the view taken of such transactions in Moore v. Tearney, 62 W. Va. 75, 57 S. E. 263, where it is said "that one who puts it in the power of another to commit fraud must take the consequences." Neslin v. Wells, 104 U. S. 428, 26 L. Ed. 802. In the case of A., T. & S. R. R. Co. v. Hurley, supra, it is said that "in bankruptcy proceedings courts of equity will act on broad equitable lines with a view of recognizing and enforcing the rights of all parties claiming an interest in the estate," and, applying these principles to the present case, the petitioner must show by clear, positive, and conclusive testimony that he is entitled to the relief which he asks. His testimony is vague, indefinite, and contradictory, whilst the testimony offered to rebut his contention is fair, reasonable, and comes from disinterested witnesses, and on the merits has failed to prove the averments of his petition. On the question of proof in such cases in the Maxwell Land Grant Case, 121 U. S. 325, at pages 380 and 381, 7 Sup. Ct. 1015, at page 1028, 30 L. Ed. 949, the court says: "Canceling a contract is an exercise of the most extraordinary power of a court of equity, and cannot be exercised on a mere preponderance of evidence. The evidence must be clear and unequivocal and convincing, which does not leave the issue in doubt."

For the reasons herein stated, the referee is of opinion that the petitioner, H. S. Carr, is not entitled to the relief which he asks in his petition.